## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

Nora Hilgart-Griff, Jared Eno,
Kristen Bagdasarian, Zaynab
Elkolaly, Rhea Chappell, and
Arwa Hassaballa, individually
and on behalf of all others
similarly situated, and Students
Allied For Freedom and
Equality (SAFE),

               Plaintiffs,

v.

Regents of the University of
Michigan;
Santa Ono, individually and
and as President of the University
of Michigan,
Martino Harmon, individually and
as Executive Vice President and
Chief Financial Officer of the
University of Michigan; Omar E. Torres,
Grand River Solutions, Inc., and
Stephanie Jackson,

               Defendants.

Case No. 2:24-cv-13425
Hon. Laurie J. Michelson
Mag. Elizabeth J. Stafford

**FIRST AMENDED
COMPLAINT &
JURY DEMAND**

_____/

John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org

Lauren J. Hartz
Ishan Bhabha
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
(202) 637-6363
lhartz@jenner.com
ibhabha@jenner.com
*Attorneys for Defendants Regents of
the University of Michigan, Santa*

1

tparis@sugarlaw.org
**Attorneys for Plaintiffs**

Amy Doukoure (P80461)
COUNCIL ON AMERICAN ISLAMIC
RELATIONS-MICHIGAN LEGAL
FUND
1905 Haggerty Rd., Suite #5
Canton, MI 48188
(248) 559-2247
adoukoure@cair.com
**Attorney for Plaintiffs**

Julie H. Hurwitz (P34720)
Dayja S. Tillman (P86526)
Matthew S. Erard (P81091)
GOODMAN, HURWITZ, &
JAMES P.C. on behalf of the
NATIONAL LAWYERS GUILD,
DETROIT & MICHIGAN CHAPTER
1394 E. Jefferson Ave.
Detroit, MI 48207
313-567-6170/Fax: 313-567-4827
jhurwitz@goodmanhurwitz.com
dtillman@goodmanhurwitz.com
merard@goodmanhurwitz.com
**Attorneys for Plaintiffs**

Holland Locklear (P82236)
LAW OFFICES OF HOLLAND
LOCKLEAR, PLLC
607 Shelby St., Suite 725
Detroit, MI 48226
(833) 424-446/Fax: (248) 256-3334
holland@locklearlegal.com
**Attorney for Plaintiffs**

***Ono, Martino Harmon, Omar E.
Torres, Grand River Solutions, Inc.,
& Stephanie Jackson***

Brian M. Schwartz (P69018)
MILLER CANFIELD PADDOCK
& STONE PLC
150 W. Jefferson Ave., Suite 2500
Detroit, MI 48226-4415
(313) 496-7551/Fax: (313) 496-8451
schwartzb@millercanfield.com
***Attorneys for Defendants Regents of
the University of Michigan, Santa
Ono, Martino Harmon, Omar E.
Torres, Grand River Solutions, Inc.,
& Stephanie Jackson***

Ezra Ritchin
367 St. Marks Ave, #1132
Brooklyn, NY 11238
(917) 725-0116
ritchinezra@gmail.com
***Attorney for Plaintiffs***

Sara Dagher (P87077)
3950 W. Eleven Mile Road
Berkley, MI 48072
(313) 474-4287
shhdagher@gmail.com
***Attorney for Plaintiffs***

Huwaida Arraf
c/o Goodman Hurwitz & James, PC
1394 E. Jefferson Ave.
Detroit, MI 48207
(248) 987-8701
huwaida4michigan@gmail.com
***Attorney for Plaintiffs***

/

## FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs NORA HILGART-GRIFF, JARED ENO, KRISTEN BAGDASARIAN, ZAYNAB ELKOLALY, RHEA CHAPPELL, and ARWA HASSABALLA, individually and on behalf of others similarly situated, and STUDENTS ALLIED FOR FREEDOM AND EQUALITY ("SAFE") by and through their attorneys and for their First Amended Complaint against the Defendants do hereby allege as follows:

## I.     NATURE OF PLAINTIFFS' CLAIMS

1.     This is a federal civil rights claim brought pursuant to 42 USC §1983 for Defendants' violations of the Plaintiffs' constitutional rights under the United States Constitution amend. I and amend. XIV.

2.     This lawsuit arises from Defendants' violations of free speech, due process, and equal protection rights resulting from retaliation and discrimination against students based on the content of their speech and based on students' viewpoint on issues of significant interest to the university community[1] and to the public at large.

---

[1] The term "University community," as used herein, refers to students, faculty, and staff members at the University. This definition aligns with the University's definition and use of the term throughout the *Statement of Student Rights and Responsibilities* that applies to the Plaintiffs conduct and disciplinary proceedings at issue in this case.

3.     The Defendants acted against the Plaintiffs because of their advocacy for the human rights of Palestinians and for their calls for the University of Michigan to divest from Israel to help stop the genocide against the Palestinian people. But for their viewpoint on this issue, Plaintiffs would not have had their Free Speech/Petition/Assembly, Due Process, and Equal Protection rights violated.

4.     Specifically, Defendants acted against these Plaintiff students and violated their rights through conduct including but not limited to the following:

- initiating disciplinary proceedings against and issuing disciplinary sanctions to Plaintiffs for speech-related conduct while it has not subjected any other students or student groups engaged in similar conduct to disciplinary proceedings,  reprimands or other punishments;

- conducting disciplinary proceedings in a manner that radically departs from published rules and long-standing practices for such proceedings, and in a manner that has never been implemented in proceedings against any other students or student groups;

- during disciplinary proceedings, undertaking a series of actions that violate the most basic notions of due process;

- imposing prior restraints on the speech of the only recognized undergraduate student group advocating for the viewpoints of Plaintiffs by requiring the group to obtain a permit before speaking on or near the university's Diag; and

- initiating disciplinary proceedings which resulted in a two-year suspension against the only recognized undergraduate student group advocating Plaintiffs' viewpoints based solely on the group's engagement in Constitutionally protected speech on its Instagram account.

- banning from campus the only recognized legacy undergraduate student group advocating for the viewpoints of Plaintiffs.

4

## II.   <u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §1331 (federal question). Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§1983 and 1988, and Fed. R. Civ. P. 57.

6.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b), since a substantial part of the events or omissions giving rise to the claim occurred in and multiple Defendants reside in this district.

## III.   <u>PARTIES</u>

7.     Plaintiff NORA HILGART-GRIFF ("HILGART-GRIFF") is a resident of the Township of Ann Arbor, County of Washtenaw, State of Michigan, and is a citizen of the United States.

8.     Plaintiff HILGART-GRIFF is a graduate student at the University of Michigan.

9.     Plaintiff JARED ENO ("ENO") is a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan, and is a citizen of the United States.

10.     Plaintiff ENO is a graduate student at the University of Michigan.

11.     Plaintiff KRISTEN BAGDASARIAN ("BAGDASARIAN") is a resident of the Township of Commerce, County of Oakland, State of Michigan, and is a citizen of the United States.

12.     Plaintiff BAGDASARIAN is a May 2024 graduate of the University of Michigan.

13.     Plaintiff ZAYNAB OMAR IBN AL-KHATTAB ELKOLALY ("ELKOLALY ") is a resident of the City of Ypsilanti, County of Washtenaw, State of Michigan, and is a citizen of the United States.

14.     Plaintiff ELKOLALY is an August 2024 graduate of the University of Michigan.

15.     Plaintiff RHEA CHAPPELL ("CHAPPELL") is a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan, and is a citizen of the United States.

16.     Plaintiff CHAPPELL is an undergraduate student at the University of Michigan.

17.     Plaintiff ARWA HASSABALLA ("HASSABALLA") is a resident of the Village of Lake Orion, County of Oakland, State of Michigan, and is a citizen of the United States.

18.     Plaintiff HASSABALLA is a December 2023 graduate of the University of Michigan.

19.     Plaintiff STUDENTS ALLIED FOR FREEDOM AND EQUALITY ("SAFE") is a Michigan corporation with its principal place of business in the City of Ann Arbor, County of Washtenaw, State of Michigan.

6

20.     Plaintiff SAFE was at relevant times a registered and recognized student organization at the University of Michigan, Ann Arbor.

21.     Plaintiff SAFE is a coalition of diverse members dedicated to advancing the causes of freedom, justice, human rights, and equality for all peoples. Though SAFE's mission is not limited to any single issue, their foremost objective is to promote the right of self-determination for the Palestinian people and advocate for justice for Palestinians on campus and globally.

22.     Defendant REGENTS OF THE UNIVERSITY OF MICHIGAN ("REGENTS") is the constitutional governing body of the University of Michigan, established pursuant to Article VIII, Section 5 of the Michigan Constitution of 1963. The Regents operate as public body corporate with its principal place of business in the City of Ann Arbor, County of Washtenaw, State of Michigan.

23.     Defendant REGENTS have general supervisory powers over the University of Michigan and its officers and control and direct all the institution's expenditures. The REGENTS have the power to set, amend, and enforce university policy and to ensure that the universities policies are observed by all university officials and other employees of the University.

24.     Defendant SANTA ONO ("ONO") is a resident of the City of West Bloomfield, County of Oakland, State of Michigan.

7

25.     Defendant ONO is employed by the University of Michigan, Ann Arbor as the school's President and the University's chief executive officer.

26.     Defendant ONO's duties and functions include general oversight powers inherent as chief executive of the university, including but not limited to oversight of all university vice presidents, oversite of all staff and contractors, and maintaining order and the welfare of students. He has the power to set, amend, and enforce university policy and to ensure that the universities policies are observed by all university officials and other employees of the University.

27.     Defendant ONO is sued in his individual and official capacities.

28.     Defendant MARTINO HARMON ("HARMON") is a resident of the City of Ann Arbor, County of Washtenaw, State of Michigan.

29.     Defendant HARMON is employed by the University of Michigan, Ann Arbor as the Vice President for Student Life.

30.     Defendant HARMON is sued in his individual and official capacities.

31.     Defendant HARMON's duties and functions include oversight powers of student life, including student and student organization discipline.

32.     Defendant OMAR TORRES ("TORRES") is a resident of the City of Atlanta, County of Fulton, State of Georgia.

33.     Defendant TORRES is employed by Defendant GRAND RIVER SOLUTIONS, INC. as a student conduct services consultant.

34.    At some point during his work with Defendant GRAND RIVER, Defendant TORRES became a temporary employee of the University of Michigan, Ann Arbor.

35.    Defendant TORRES is sued in his individual and official capacities.

36.    Defendant GRAND RIVER SOLUTIONS, INC. ("GRAND RIVER") is a Delaware corporation with its principal place of business in the City of Los Altos, California and is registered to do business in the State of Michigan as a foreign corporation.

37.    Defendant GRAND RIVER is retained by the University of Michigan to bring disciplinary proceedings against students involved with campus protest activities with viewpoints such as those advocated by the Plaintiffs.

38.    Defendant STEPHANIE JACKSON ("JACKSON") is a resident of the City of Columbus, County of Franklin, State of Ohio.

39.    At some point during her work as a consultant, Defendant JACKSON is believed to have been contracted by the University, and later, to have become a temporary employee by the University of Michigan, Ann Arbor.

40.    At all relevant times, Defendants REGENTS, ONO, HARMON, TORRES, GRAND RIVER, and JACKSON were acting under color of law when Plaintiffs' rights were violated.

41.    At all relevant times, Defendants TORRES, GRAND RIVER, and

JACKSON were engaged in a public function and/or there was a sufficiently close relationship between the University and the conduct alleged herein such that the action of the Defendants are fairly treated as that of the state.

42.    Additionally, at all relevant times, Defendants were acting jointly with, on behalf of, and as an express agent or employee of the University of Michigan when engaged in the conduct alleged herein and as a result, were engaged in state action and were state actors when undertaking such conduct.

## IV.    STATEMENT OF COMMON FACTS

43.    The University of Michigan ("UM" or "the University") is a public university with campuses in Ann Arbor, Dearborn, and Flint, Michigan.

44.    The University is governed by a Board of Regents comprised of eight voting members plus the University President, who is an ex officio member of the Board.

45.    Voting members of the Board of Regents are elected in biennial state-wide elections and serve overlapping eight-year terms.

46.    The Board of Regents has general supervisory powers over the University and its officers and control and direct all the University's expenditures.

47.    The Board has four standing committees, two of which perform the following duties:

a. *Finance, Audit and Investment Committee*: Assists the board in fulfilling its responsibilities relating to, among other matters, oversight

10

of the University's investment policies and practices; and

    b. *Personnel, Compensation and Governance Committee*: Assists the board in evaluating the performance of the University president and advises the president on the performance of executive officers.

48.    The Board of Regents is responsible for selecting the President of the University.

49.    At all relevant times, Defendant ONO has been the President of the University.

50.    As noted above, the President's duties include general oversight powers inherent in the role of chief executive of the University, including the supervision of the University's executive officers.

51.    The Vice President for Student Life is an executive officer of the University of Michigan and serves under the direction of the University's President.

52.    The Vice President for Student Life's duties include acting as the final adjudicator on appeals of decisions made in disciplinary hearings brought against students and student organizations.

53.    Throughout the time-period at issue, Defendant HARMON has been the University's Vice President for Student Life.

54.    The University's Office of the Vice President and General Counsel provide representation and advice to the University's Board of Regents, President, and Executive Officers, including the University's Vice President for Student Life.

11

55.     Defendants GRAND RIVER, OMAR TORRES, AND STEPHANIE JACKSON have been retained by the University's Office of the Vice President and General Counsel to bring complaints on behalf of the University in disciplinary proceedings brought against students and student organizations[2].

### The University of Michigan is a Public University that Expressly Condones, Encourages, Celebrates and Prides Itself on Traditions of Free Speech and Student Protest

56.     The University of Michigan has a strong tradition of students, staff, and faculty exercising their free speech rights to advocate on a wide range of issues and to call for action to be taken by the University, the public, and the nation.

57.     For decades, members of the UM Community have raised their voices and advocated, on campus, at demonstrations, rallies, teach-ins, marches, strikes, sit-ins, pickets, and educational events for many important social and political issues. These issues include, but are not limited to, the Vietnam War, the Civil Rights Movement, climate change, racial justice, reproductive justice, workers' rights, and Israel-Palestine.

58.     Divestment campaigns are one example of a successful and important form of student advocacy at the University of Michigan.

---

[2] Reports from Defendant REGENTS state that the contract for Grand River Solutions for $750,000 and is with the Office of General Counsel. The engagement letter with Defendant Grand River is signed by the University's Executive Vice President and Chief Financial Officer on letterhead for the Office of General Counsel.

59.     Students, staff, faculty, and community members led a powerful movement calling upon the University to divest its financial holdings from apartheid South Africa. For decades, the UM student movement against apartheid leveraged demonstrations, marches, sit-ins, and campaigns to educate and push the University administration, Board of Regents, and state officials to divest from South Africa.

60.     After years of protest the University's Board of Regents passed its first resolution to divest from apartheid South Africa in the late 1970s.

61.     In 2000, the University of Michigan divested from tobacco companies. In 2002, the University began the process of divesting from fossil fuels. In 2022, the University divested from Russia. Each of these actions by the Board of Regents followed advocacy, demonstrations, and other protest activity by students, faculty, and/or staff at the University of Michigan.

62.      Today, the University of Michigan commemorates the campus' long history of sit-ins, protests, demonstrations, marches, teach-ins, and divestment movements in its classrooms, academic buildings, alumni magazines, websites, and symposiums and events.

63.     University administrators express their admiration for the University of Michigan's long history of student activism—in brochures directed to prospective students, on murals on campus buildings, in classroom instruction, in social media posts, and through school-wide emails to the University community.

13

64.     Dating back to the Civil Rights Movement and Vietnam War era, the University is believed to have maintained a consistent policy of neither bringing disciplinary proceedings against students who raise their voices to advocate on issues of social and political importance nor threatening suspension of student groups who supported students' advocacy activities.

65.     Likewise, sit-ins at the University President's office have long been recognized, common, and acceptable form of protest and method of demonstration at the University for decades. The President's office is in the Alexander G. Ruthven Building ("Ruthven Building"). The building is open to the public and accessible to students via University-issued access cards. Historically, students sit-ins in the building's common areas – intended to deliver a message to the Present or the President's representative – have not resulted in the administration calling in law enforcement from multiple jurisdictions, closing the building, or initiating disciplinary proceedings, let alone initiating such proceedings months after a protest occurred.

66.     The University's own *Free Speech on Campus* webpage reflects the University's policies and practices, stating that the University "has long welcomed dissent, advocacy, and the expression of the broadest array of ideas, even those that could be unpopular, upsetting or critical of the university."[3]

_____

[3] *See* https://publicaffairs.vpcomm.umich.edu/key-issues/free-speech-on-campus/.

14

**After the Invasion of Gaza by Israeli Forces, the Methods of Student Advocacy Calling for Divestment from Israel Have Not Changed, But the University's Response to These Expressions of Free Speech Have Dramatically Changed.**

67.     Student groups advocating both in support of Palestinian rights and in support of the Israel have long existed on the University of Michigan's campus. For nearly two decades, there has been a movement of students, faculty, staff, and community members at the University advocating for the human rights of Palestinians and calling for the University's divestment from Israel and companies complicit in violations of Palestinian human rights..

68.     The methods of protest and activism used by the divestment movement at the University of Michigan – including peaceful demonstrations, sit-ins, vigils, and educational programming – have remained consistent over time. Yet, since October 7, 2023, the administration's responses to pro-Palestine and pro-divestment speech and protest activities have changed dramatically.

69.     Since October 7, 2023, student activities on campus – both in support of and in opposition to Israel's actions in Gaza – have dramatically increased. These activities have included marches, vigils, sit-ins, and other educational events and expressive activities by students, faculty, and staff.

70.     Yet, despite this broad spectrum of activities, since October 7, 2023, the University has solely targeted, discriminated against, and punished students for engaging in speech and protest activity in support of Palestine and to petition the

15

University to divest from Israel as a means of pressuring Israel to cease human rights violations against the Palestinian people, including crimes against humanity and genocide.

71.     Defendants have targeted students, including the Plaintiffs, who they perceive to be leaders among the student movement for Palestine and/or they are seeking to use as examples to deter others from engaging in similar advocacy and expressing similar viewpoints.

72.     In so doing, Defendants have taken a range of punitive measures, including initiating student disciplinary proceedings against individual pro-Palestine students and student organizations, terminating pro-Palestine workers' employment from campus jobs, blacklisting pro-Palestine workers' from future employment at the University, and issuing trespass notices preventing pro-Palestine students from attending classes, accessing administrative buildings, or even entering the University's Ann Arbor, Dearborn or Flint campuses.

73.     No such measures are known to have been taken at any time during the previous half century by the University against students engaging in speech and other expressive activities on other important political and human rights issues.

74.     No such measures are known to have currently been taken by the University against students engaging in speech and other expressive activities on any other issue, including students who advocate in support of Israel.

16

75.     The University of Michigan is targeting students, including Plaintiffs, through actions that include weaponizing, selectively enforcing, manipulating, and abusing the University's established policies and procedures to wrongfully discipline students and student organizations in an attempt to silence and repress the viewpoints related to divestment from Israel and ending the genocide against the Palestinian people.

### The University of Michigan Has Established Policies and Practices Regarding Initiating and Conducting Student Disciplinary Proceedings

76.     All students at the University are expected to follow and abide by the requirements of the *Statement of Student Rights and Responsibilities* ("*Statement*").

77.     The *Statement* in effect at the time of the events referenced herein only – i.e., the version established July 2022 – permits a student, faculty, or staff member of the University to initiate a complaint against a student alleging a violation of the *Statement*.

78.     The *Statement* professes a commitment to "intellectual inquiry through vigorous debate" and notes that the:

> University has a long tradition of student activism and values freedom of expression, which includes voicing unpopular views and dissent. As members of the University community, students have the right to express their own views and must also take responsibility for according the same right to others.

79.     If a violation of the *Statement* is alleged, the Office of Student Conflict

17

Resolution ("OSCR") facilitates a three step Resolution Process.

80.     The *Statement* outlines the three step process as: Stage 1: Initiating the

Process; Stage 2: Resolution Process; Stage 3: Appealing the Resolution Process.

81.     Both current and previous versions of the *Statement*, provide that the

version in effect at the time of the events at issue governs the disciplinary

proceedings.

82.     The *Statement* provides that all complaints must be submitted to a

Resolution Coordinator ("RC"), in writing, within six months of the incident(s)

alleged in the complaint.[4]

83.     Next, if the RC determines, after reviewing the information made

available to them, that the alleged conduct may be a violation of the *Statement*, the

RC will notify the respondent and schedule a meeting to discuss potential  pathways

for resolving the complaint.

84.     The Respondent is to have the choice of the following methods of

dispute resolution: A. Acceptance of Responsibility and Entering into an Agreement;

B. Adaptable Conflict Resolution; C. Formal Hearing. If a formal hearing is chosen

for resolution, the matter can be "arbitrated" before either a Resolution Officer

("RO") who is a member of the faculty or staff at the University or by a Student

---

[4] The RC may waive the six-month limitation when a late submission is
reasonable.

Resolution Panel ("Student Panel").

85.     The University's rules provide that the respondent is presumed not responsible unless the evidence presented by the complainant demonstrates that it is more likely than not that a violation of the *Statement* has occurred.

86.     The rules further provide that the respondent's silence cannot be interpreted as evidence that a violation occurred.

87.     In cases that involve more than one respondent, the rules allow students to choose whether to have individual or group hearings.

88.     During the hearing, the RO, RC, respondent, complainant, and student panelists (if applicable) have the right to question the complainant and the RC.

89.     These participants may also question the respondent, if the student chooses to participate, and any witnesses who have presented information.

90.     Each party may be accompanied at the hearing by a personal advisor; however, the advisor may not directly participate in the proceedings.

91.     The respondent and the complainant may call any witness with information relevant to the case, but the RO may exclude a witness if the information is irrelevant or redundant.

92.     The rules provide that, prior to the hearing, all parties are permitted access to written material and other information that will be considered by the RO/Student Panel.

93.     The complainant and respondent may make statements to the RO/Student Panel both at the beginning and end of the hearing.

94.     All arbitrated resolutions will result in findings of fact by the RO/Student Panel. The RO/Student Panel will also make recommendation(s) regarding sanctions and/or interventions to the Dean of Students, who may accept or modify the recommendation(s).

95.     The Dean of Students' decision can include a variety of sanctions, including but not limited to educational measures, formal reprimand, disciplinary probation, student employment consequence, suspension, or expulsion.

96.     A decision may be appealed, and appeals shall be reviewed by an Appeals Board that is composed of one student appointed by the Central Student Government ("CSG"), one faculty member appointed by the Faculty Senate, and one administrator appointed by the President.

97.     The Appeals Board reviews all materials related to the case as well as all decisions made and makes a recommendation to the Vice President of Student Life.

98.     The Vice President of Student Life may accept or modify the recommendations of the Appeals Board.

99.     The Vice President of Student Life is the ultimate decision-maker of the appeal.

20

**The Regents Unilaterally Alter the *Statement* to Permit the
University Itself to Initiate Disciplinary Proceedings Against Students**

100.   The *Statement* is open to amendments every three years.

101.   The Vice President for Student Life, Student Relations Advisory Committee of the Senate Assembly, Chair of the Faculty Senate Assembly, and CSG President may unanimously agree to have an off-cycle amendment period if necessary.

102.   The Student Relations Advisory Committee of the Senate Assembly has primary oversight of the review and various rules provide for the method of proposing, reviewing, and advancing proposed Amendments.

103.   Prior to 2024, the most recent amendment of the *Statement* went into effect on July 1, 2022.

104.   The next scheduled review and/or amendment of the *Statement* was to take place in 2025.

105.   However, in July 2024, Defendant ONO ignored the existing rules and directly submitted a Request for Action to Defendant REGENTS to make changes to the *Statement*.

106.   On or about July 18, 2024, with less than 40 seconds of deliberation and without substantive discussion, Defendant REGENTS unilaterally approved and accepted Defendant ONO's proposed changes to the *Statement*.

107.   The most notable change to the *Statement* included a provision allowing

the University itself to act as a complainant to initiate disciplinary proceedings alleging a violation of the *Statement*.

108.   Within the University community, this change is widely understood to have been adopted to allow the University to directly target students who are advocating in support of Palestinian human rights and divestment from Israel.

109.   In practice, this change has only been used to initiate proceedings against students expressing pro-Palestine viewpoints and no others.

110.   Other notable changes to the *Statement* included removing the ability of a Student Panel to arbitrate the dispute and, on appeal, eliminating the role of the Appeals Board to allow the Vice President for Student Life or their designee to solely make the determination on an appeal.

111.   On November 8, 2024, the University of Michigan's Faculty Senate passed a resolution to censure Defendant REGENTS in part based on the unilateral changes that Defendant REGENTS made to the *Statement* and the recent adoption of a Regents Bylaw on institutional neutrality

112.   At their July 2024 meeting, Defendant REGENTS also amended the UM Standard Practice Guidelines to expand prohibitions and punishments of students who "disrupt University activities or operations" or "obstruct human or vehicle traffic, ways of ingress and egress, paths, stairs, aisles and the like." SPG 601.41

113.   This change was adopted by the Defendant REGENTS in direct

22

response to a pro-Palestine demonstration at the 2024 Honors Convocation and after

overwhelming opposition within the University community defeated a proposed new

Disruptive Action Policy.

### Students Hold a Peaceful Sit-In in the Public Space Outside the University President's Office and the University Takes Unprecedented Response in Opposition

114.   On November 17th, 2023, students entered the Ruthven Building to

hold a sit-in in order to petition Defendant ONO to meet with students and

meaningfully discuss divesting University funds from institutions and companies

complicit in Israel's apartheid and genocide.

115.   Students sought to hold a sit-in during normal business hours in the

lobby of the President's office and other common areas of the Ruthven Building as

expressive activity highlighting the need for divestment to help stop the genocide

against the Palestinian people. Students sought to call on their President to speak to

them and meaningfully discuss divestment as a tool for stopping a genocide.

116.   Over the course of decades at the University, countless students have

held sit-ins and other expressive demonstrations at this very location—in the lobby

of the President's office and the common areas of the Ruthven Building—to demand

that University administration engage in meaningful dialogue with students on

matters of social and political importance.

117.   Students and other members of the University community have long

had access to the Ruthven Building and student access cards have allowed students to freely enter the building throughout the day.

118.   In fact, students held an almost identical demonstration a few weeks prior to November 17, 2023 which resulted in students speaking to an administrator who promised follow-up on their requests for a meeting to discuss divestment. Students returned on November 17 to reiterate their prior requests when no meeting was forthcoming and to request a meeting directly with Defendant ONO.

119.   On that day, students marched from the Diag before arriving at the Ruthven Building.

120.   Upon arrival, students entered the Ruthven Building, sat in a circle, and sang peace songs.

121.   However, in an unprecedented break from its previous policies and practices, police from over *ten different law enforcement departments* were called by the University to physically remove the peacefully protesting students from the building.

122.   As a result, forty-two students were arrested on November 17, 2023 – all for minor charges of failing to leave the building when first ordered to do so. Students were written citations by police officers at the building, and were released by the officers on the scene without further incident.

123.   None of the students engaged in intentional acts of violence, none

intentionally harmed any police officers or administration officials, and none engaged in intentional acts of property destruction.

124.   Several students were, however, injured by overly aggressive police tactics used in attempting to bar persons from entering the building and in attempting to physically remove persons engaged in the sit-in.

125.   Plaintiff JARED ENO attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff ENO stood with his fellow students, chanted, and called for Defendant ONO to meaningfully discuss divestment with students. No criminal charges were brought against him.

126.   Plaintiff NORA HILGART-GRIFF attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff HILGART-GRIFF joined her peers to sit-in outside Defendant ONO's office, held hands with her classmates, and raised her voice in support of divestment. No criminal charges were brought against her.

127.   Plaintiff KRISTEN BAGDASARIAN attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff BAGDASARIAN stood peacefully in the Ruthven Building, sang the song "solidarity forever" with her peers, and chanted "free Palestine" with other students in the various languages that students spoke. No criminal charges were brought against her.

128.   Plaintiff ZAYNAB ELKOLALY attended the sit-in at the Ruthven Building on November 17, 2023. While attempting to enter the building, which she

believed was still open to the public, Plaintiff ELKOLALY became caught between a crowd of persons trying to enter the building and police officers. While turned away and with her back to the police, she was then violently thrown to the ground by a University of Michigan police officer and her hijab was ripped off. She was then assisted to her feet by another officer who directed her to stand next to him, which she did.  After a few minutes, the officer allowed her to join the other students who were engaged in the sit-in. She joined her peers singing songs and chanting for Defendant ONO to meet with students. No criminal charges were brought against her.

129.   Plaintiff RHEA CHAPPELL attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff CHAPPELL joined her peers sitting in a circle outside Defendant ONO's office and sang songs to call for peace and an end to Israel's genocide in Palestine. No criminal charges were brought against her.

130.   Plaintiff ARWA HASSABALLA attended the sit-in at the Ruthven Building on November 17, 2023. Plaintiff HASSABALLA chanted alongside fellow students calling for the freedom and liberation of Palestine. No criminal charges were brought against her.

**The University of Michigan Hired Outside Consultants<br>to Initiate Disciplinary Hearings Against Students Because<br>of Students' Views Supporting Divestment and Palestine**

131.   At all relevant times, each of the individual Plaintiffs was enrolled as a

full-time student at the University of Michigan in Ann Arbor.

132.   As students at the University, each of the individual Plaintiffs possessed important liberty and property interests in their status as students.

133.   At all relevant times, Plaintiff SAFE was a registered and recognized student organization at the University of Michigan in Ann Arbor with liberty and property interests of their own and through their student members.

134.   On May 15, 2024, some students who attended the November 17, 2023 Ruthven sit-in, received their first notification in an email from OSCR indicating that a complaint had been initiated against them for an alleged violation of the *Statement* during the sit-in at the Ruthven Building on November 17, 2024. No actual complaint was included in this email.

135.   The May 15, 2024, email from OSCR was the first notification of any kind that any students received regarding an alleged violation of the *Statement* in connection with the sit-in that occurred six months prior.

136.   Plaintiffs ENO, ELKOLALY, AND CHAPPEL received the May 15. email from OSCR, and the email stated that the *Statement* that took effect on July 1, 2022 would govern the conflict resolution proceedings that would follow.

137.   Plaintiff ENO had an intake meeting with OSCR on May 30, 2024. Plaintiff ENO did not receive a formal complaint in writing at that time.

138.   At the time of the intake meeting, Plaintiff ENO still had not received

a formal complaint in writing. Plaintiff ENO asked who had initiated the complaint and was told that it was initiated by Defendant TORRES. At that time, he was told that Defendant TORRES was a member of the University's Human Resources Department.

139.   Plaintiff ENO searched the University's campus directory and found no one with the name Omar Torres in the system, but through the internet found a consultant with that same name who is employed by Defendant GRAND RIVER.

140.   Plaintiff ENO submitted a Freedom of Information Act ("FOIA") request for "any and all university email communications to or from Omar Torres, either at his Grand River Solutions email address or his UM email address."

141.   Plaintiff ENO received a response stating that "Omar Torres was not an employee of the University of Michigan prior to June 7, 2024."

142.   Plaintiff ENO also received an engagement letter between the University and Defendant GRAND RIVER. The letter states that the:

> University is engaging Senior Solutions Specialist Omar Torres of Grand River Solutions, Inc. and any additional staff members as needed for him to fulfill his role (collectively, "GRS") to serve as a Complainant, on behalf of the University, pursuant to the Statement of Student Rights and Responsibilities or other applicable University policies.

143.   On June 10, 2024, Plaintiff ENO received a complaint from Defendant TORRES. The complaint was dated June 3, 2024, during which time Mr. Torres was

28

a third-party consultant of the University.

144.   On July 10, 2024, A second group of students, including HILGART-GRIFF BAGDASARIAN, HASSABALLA received the same initiation of a complaint notice via email from OSCR and a complaint from Defendant TORRES. The complaints from Defendant TORRES were also dated June 3, 2024. The email stated that the *Statement* that took effect on July 1, 2022 would govern the proceedings.

145.   Over 25 students who attended the November 17, 2024 Ruthven sit-in (hereafter "Ruthven OSCR Respondents") received the same complaint signed by Defendant TORRES.

146.   No such actions by the University are known to ever have been taken to seek OSCR proceedings against students participating in a sit-in at the Ruthven Building.

147.   Ruthven OSCR Respondents received complaints from Defendant TORRES alleging the following two violations of the *Statement*:

- N. Obstructing or disrupting classes, research projects, or other activities or programs of the University; or obstructing access to university facilities, property, or programs (except for behavior that is protected by the University's policy on Freedom of Speech and Artistic Expression).

* * *

- Q. Failing to comply with lawful requests to leave a University controlled premises.

148.   All of Defendant TORRES' complaints were dated June 3, 2024 —

29

after the 6-month filing deadline. No information has ever been provided as to why an extension was reasonable or allowed.

149.   Similarly, all of Defendant TORRES' complaints were made when he was neither a student, faculty, nor staff member of the University.

150.   At the time of the complaints, Defendant TORRES was an outside consultant of the University.

151.   No such actions by the University are known to ever have been to allow a persons who is neither a student, faculty, nor staff member of the University to initiate a complaint against a student.

152.   No such actions by the University are known to ever have been taken to retain an outside consultant to bring complaints and initiate OSCR proceedings against students.

153.   All of Defendant TORRES' complaints stated that he was seeking a Formal Reprimand as a sanction for the alleged violations of the *Statement*.

154.   A Formal Reprimand is a formal notice noted on a student's record that the *Statement* was violated and that future violations will be dealt with more severely.

155.   At the relevant time, the *Statement* allowed only a student, faculty, or staff member to initiate proceedings against a student. The *Statement* does not permit the University itself or others to initiate proceedings against a student.

156. Despite the *Statement* stating that Adaptable Conflict Resolution ("ACR") is available to respondents as one pathway to resolution of OSCR proceedings, Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and all other similarly situated students who participated in the Ruthven sit-in were told that the ACR pathway was not available to them due to the choice of Defendant TORRES.

157. Twenty-five Ruthven OSCR Respondents, including Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, requested to have a collective arbitration before a Student Panel. Their request was granted. This group is hereafter referred to as the Ruthven OSCR Collective Arbitration Respondents.

158. Ruthven OSCR Collective Arbitration Respondents were given only one week to prepare, including collecting and submitting any and all witness statements and evidence to OSCR.

159. Defendant TORRES did not provide any individualized evidence that required a fact-based inquiry specific to any individual participating in the Ruthven OSCR Collective Arbitration Respondents group.

160. On August 30, 2024, the Collective Arbitration was held before the Student Panel and facilitated by the RO.

161. At the August 30 Collective Arbitration Defendant TORRES issued a

statement at the beginning of the session stating – *without any prior notice* – that he was changing the sanction sought in the complaint from a formal reprimand to disciplinary probation, which a more severe disciplinary sanction. OSCR Collective Arbitration Respondents did not have any opportunity to consider this new and greater sanction sought by Defendant TORRES or prepare a meaningful defense to this new sanction prior to the Collective Arbitration.

162. The Student Panel found all twenty-five Ruthven OSCR Collective Arbitration Respondents, including Plaintiffs herein, not responsible for either violations N or Q of the *Statement*.

163. The Student Panel found that Defendant TORRES had failed to establish that Plaintiffs and other students obstructed any proceedings of the University and failed to establish that the students failed to leave the Ruthven Building when instructed to do so. The Student Panel noted that Defendant TORRES did not introduce any evidence or testimony from any witness stating that the particular students against whom the complaints were brought engaged in any of the alleged conduct.

164. On September 13, 2024, Defendant TORRES submitted an appeal on behalf of the University—again the University could not be a Complainant or initiate an appeal under the *Statement* in effect—claiming that "proper procedures were not followed" and "the evidence clearly does not support the findings."

165. On September 29, 2024, an Appeals Board unanimously recommended to the Vice President for Student Life that the Student Panel's decision be confirmed and raised a number of areas of concern regarding the OSCR process including a lack of transparency in selection of the complainant. Further, the Appeals Board further emphasized that "to allow a Complaint from the University of Michigan is a concerning precedent."

166. On October 21, 2024, Defendant HARMON, as the University's Vice President for Student Life, ignored the recommendation from the Appeals Board and unilaterally reversed the Student Panel's decision and modified the original finding of the Student Panel to find the Ruthven OSCR Collective Arbitration Respondents responsible for violation Q of the *Statement*.

167. Defendant HARMON issued all the Ruthven OSCR Collective Arbitration Respondents a formal reprimand based on that violation.

168. Defendant HARMON based his decision on two findings of his own. First he found that a list of student names provided by the University's Division of Public Safety and Security ("DPSS") allegedly identifying students to whom trespass warnings had been issued was sufficient evidence that the students engaged in the conduct at issue.

169. The alleged trespass warning list, which neither the Student Panel nor the Ruthven OSCR Collective Arbitration Respondents themselves were able to see,

33

is believed to have been nothing more than a list of names of students who were issued trespass warnings on November 17, 2023 by DPSS.

170. The trespass warnings list, however, did not identify, in any way, the basis upon which the trespass warnings were issued.

171. A separate university policy – the University's Division of Public Safety and Security Official Order 41 Policy – Trespass Warning – permits the UMPD broad discretionary authority to issue trespass warnings to nonstudents for a wide range of conduct.

172. The policy however specifically states that "students…should not be issued the trespass warning" unless extenuating circumstances exist such as posing an immediate threat to the safety of others.

173. In the absence of testimony or any other evidence disclosing the basis for the trespass warnings, it cannot be presumed that the warnings were issued based on any alleged violations of the *Statement*, particularly when University policy states that trespass warnings should not be issued for simple violations of the student code of conduct.

174. No such actions to change evidentiary standards and permit an unverified list – which was never even shown to the Respondents – allegedly showing the issuance of a trespass warnings alone to serve as conclusive evidence that the *Statement* was violated by respondents are known to have ever been taken

by the University against any other students participating in an OSCR proceeding.

175.   Second, Defendant HARMON found that the students' silence was evidence of their guilt, writing:

> [A]ll respondents could have, [*sic*] and presumably would have submitted evidence to refute their involvement if such information were available. I find no such evidence submitted by the respondents which lends further credibility to the assertion that all those charged as respondents are indeed those individuals receiving a citation for trespass in the Ruthven building on the 17th of November 2023.

176.   In so doing, Defendant HARMON shifted the burden of proof from the complainant to the respondents.

177.   The Statement further explicitly states that "silence by the respondent will not be interpreted as evidence of responsibility for a violation." Yet, Defendant HARMON did the exact opposite—finding silence to be evidence of an admission of guilt.

178.   The *Statement* requires that the complainant prove by a preponderance of the evidence that a violation occurred.

179.   Yet, Defendant HARMON reversed the Student Panel and retroactively established an entirely different burden of production, burden of proof, and standard of review after the hearing had concluded and the time for the introduction of evidence had passed.

180.   No such actions to, after a hearing has occurred, retroactively shift the

burden of proof from the complainant to the respondents and shift the consequence of silence to become evidence of guilt and thereby changing the standard of review are known to have ever been taken by the University against any other students participating in an OSCR proceeding.

181.   No such actions to unilaterally reverse the findings of a student panel are known to have been taken by the University against any other students participating in an OSCR proceeding.

182.   Defendant TORRES continues to bring additional complaints alleging violations of the *Statement* against pro-Palestine student protesters, including against Plaintiff ELKOLALY.

183.   Defendant TORRES has admitted during disciplinary proceedings that he has *only* initiated complaints alleging violations of the *Statement* against students who have expressed pro-Palestine viewpoints.

184.   The University's OSCR process continues to suffer the same defects in procedures, burdens of proof, evidentiary standards, and the lack of neutral decisions makers in subsequent and ongoing proceedings against students who express pro-Palestine viewpoints.

**SAFE Is the Only University Recognized
Undergraduate Organization Dedicated to Advocating for Divestment
And for the Human Rights of Palestinian People
And Has Been Suspended from Campus by the University**

185.   Plaintiff SAFE was founded in 2001 by a group of students at the

University of Michigan with a main objective of educating the campus community on issues concerning the State of Israel's occupation of Palestine, while advocating for Palestinian rights and protesting Israeli violations of human rights and international law.

186.   SAFE is a community hub for Palestinian students at the University of Michigan. As the only student organization dedicated to celebrating the Palestinian identity, SAFE regularly hosts events such as educational panels and cultural celebrations to share Palestinian food, culture, history, and identity.

187.   Plaintiff SAFE is a recognized student organization ("RSO") at the University of Michigan.

188.   Plaintiff SAFE is the Students for Justice in Palestine ("SJP") Chapter at the University of Michigan—Ann Arbor.

189.   All RSOs are required to abide by the *Standards of Conduct for Recognized Student Organizations* ("*Standards*").

190.   RSOs enjoy a variety of privileges at the University including, but not limited to, the ability to have opportunities for the development of leadership skills, maintain a university account for funds, receive a direct and regular financial allocation from the University, have access to office space and the ability to reserve space on campus, and receive administrative support from university staff.

191.   If an allegation is raised that a student organization violated the

*Standards*, the University will follow the procedures outlined in the Student Organization Advancement and Recognition ("SOAR") Accountability Procedure Manual.

192.   Complaints against an RSO are initiated by filing an official complaint form with the Center for Campus Involvement ("CCI").

193.   CCI staff will conduct an intake with the complainant to share information with them regarding options to resolve their complaint. There are Informal, Adaptable Conflict Resolution, and Formal Resolution Processes outlined under the SOAR Accountability Procedure.

194.   The Formal Resolution Process requires a hearing by a student-panel appointed by CSG.

195.   Following the hearing, panel members deliberate, and then take a vote to determine whether the RSO is in violation of the *Standards*.

196.   The outcome is then submitted as recommendations to the Dean of Student's Office ("DOS"). The DOS can uphold, overturn, or modify the recommendations/sanctions of the panel.

197.   The DOS "must review the records to ensure just application of University policies and sanctions."

198.   A party may appeal the official decision of the DOS to an Appeal Board. Like the prior proceedings before OSCR, the Appeals Board makes a

38

recommendation to the Vice President for Student Life who may confirm or modify the recommendations.

199.   On November 1, 2024, the University of Michigan sent an email to SAFE stating that a complaint had been submitted by the University against the organization.

200.   The submission of the complaint initiated a disciplinary process outlined by the SOAR Accountability Procedure.

201.   The complaint was submitted by Defendant JACKSON.

202.   Defendant JACKSON claims to represent the University.

203.   At the time the complaint was received, Plaintiff SAFE student leaders had never heard of Defendant JACKSON.

204.   During SAFE's intake meeting with CCI staff, SAFE asked the Associate Director of the Center for Campus Involvement, who Defendant JACKSON was and what Defendant JACKSON's status was at the University of Michigan.

205.   Plaintiff SAFE was informed that Defendant JACKSON is a third-party consultant—not affiliated with the University of Michigan—who was hired to bring forward this complaint on "behalf of the University" against students.

206.   No such actions to hire an outside consultant to prosecute a complaint against a student organization are known to have been taken by the University

against any other RSOs participating in a SOAR proceeding.

207.   Defendant JACKSON's complaint alleges that Plaintiff SAFE violated the *Standards* on various independent grounds, including that the organization allegedly (1) failed to obtain a permit to conduct a "die-in" demonstration on the University's Diag during University-Sponsored Festifall event on August 28, 2024; (2) posted an Instagram message stating that they would not be "going back to school during a genocide" and thereby allegedly disrupted, threatened and intimidated students attending Festifall; and (3) that they failed to obtain a permit to host a table at a "Michigan in Color Event" on the Diag on October 16, 2024.

208.   Based on the aforementioned allegations, Defendant JACKSON and the University sought to remove Plaintiff SAFE from the University's campus for 2-4 years.

### The Die-In on the Diag

209.   Organizations ranging from fraternities to cultural organizations to non-university affiliated groups regularly utilize campus spaces—especially a central public space like the Diag—to demonstrate and freely share their opinions.

210.   For decades, students, faculty, staff, and members of the Ann Arbor community have assembled, debated, and shared their opinions on the campus Diag. The University has traditionally kept the Diag open for expressive activities, including speeches, tabling, marches, demonstrations, and protests. The Diag is

clearly a traditional public forum.

211.   The University scheduled an annual event called Festifall for August 28, 2024. The event brings together student organizations to host tables in and around the Diag and is well attended by undergraduate students and others.

212.   Plaintiff SAFE hosted a table at the event and, prior to Festifall, announced that alongside several other organizations operating on the University's campus it would participate in a "die-in" at the Diag during Festifall.

213.   When the University learned that Plaintiff SAFE and other organizations were calling for a die-in on the Diag on that day, it told Plaintiff that they would need a permit to hold the die-in and that the University would not approve such a permit.

214.   The University never inquired what the die-in entailed, or whether it would impermissibly interfere with Festifall, or any other planned events.

215.   The University only knew that the die-in was expressive activity in support of divestment to stop a genocide against the Palestinian people.

216.   In short, Plaintiff SAFE's viewpoint, and nothing more, caused the University to impose a permit requirement that amounts to an impermissible prior restraint on students' speech. No such permit requirement has been known to have been imposed by the University on other groups espousing other viewpoints and advocating other issues.

217.   On August 28, 2024, students, faculty, staff, and community members participated in a die-in on the Diag.

218.   On August 28, 2024, the University hosted Festifall. The University Fest Rules and Policies provide the rules and regulations for events such as Festifall.

219.   Defendant JACKSON's complaint alleges that Plaintiff SAFE failed to get a permit to engage in the die-in and that the die-in intimidated Festifall participants, obstructed the flow of traffic, and created a safety hazard.

220.   Yet, neither the initial complaint nor the complainant's presentation in the SOAR hearing provided any actual evidence of disruption of any activities, operations, events, or others at the Diag during the die-in.

221.   Moreover, Defendant JACKSON failed to show that *Plaintiff SAFE or its members* caused any disruption of any of the activities beyond the mere fact that some persons expressed approval of their viewpoint and other counter-protestors expressed disapproval.

222.   Participants in the die-in silently laid on the ground as the names of Palestinians under the age of 1 years old who have been killed were read aloud. Demonstrators did not take any actions to intimidate or threaten participants of Festifall and no students were obstructed from attending the event or accessing tables at the event.

223.   The die-in did not disrupt the ability of attendees of Festifall to navigate

42

the Diag or safely move about the space.

224.   The University's Fest Rules and Policies outline disciplinary measures—including a $75 fee and removal from the event—if an organization violates school policies during Festifall.

225.   SAFE has never been found to be in violation of the University's Fest Policy.

226.   Therefore, even if a first-time violation had been found, then per the University's own established rules and policies, Plaintiff SAFE should only have been subject to removal from Festifall or required to pay a $75 fine.

227.   Instead, University officials present at the event did not find Plaintiff SAFE to be in violation of the event's policies and did not seek SAFE's removal during the event itself nor was any fine assessed after the event's conclusion.

228.   By failing to utilize the disciplinary options identified in the University's own Fest Rules and Policies and instead filing a complaint through Defendant JACKSON three months after the event, the University reveals that its actions are motivated by something other than any alleged disruption of the event— and that "something other" is the pro-Palestine viewpoint that Plaintiff SAFE advocates.

229.   Counter-protesters expressing vocal support for Israel also attended Festifall and vocally expressed their viewpoint on the Diag at the same time and

place that Plaintiff SAFE and other pro-Palestine demonstrators participated in the die-in.

230. The University is not known to have taken any actions to require that pro-Israel demonstrators obtain a permit prior to expressing their speech nor is the University known to have taken any action to discipline pro-Israel supporters or organizations for the very same demonstration of speech at the very same time on the Diag, either during Festifall or at any other time.

231. Defendant JACKSON and the University targeted SAFE purely on the organization's exercise of free speech and the viewpoint of their speech.

### *The Instagram Post*

232. Defendant JACKSON's complaint on behalf of the University further alleges that Plaintiff SAFE allegedly threatened and intimidated students who attended Festifall by the simple act of posting an Instagram message stating that SAFE would not be "going back to school during a genocide."

233. The complainant seeks to weaponize an Instagram post to allege that SAFE violated the University's Violence in the University Policy.

234. The University's Violence in the University Policy is defined to regulate the following actions:

> "Acts of violence and aggression include verbal or physical actions that create fear or apprehension of bodily harm or threaten the safety of a supervisor, co-worker, faculty member, student, patient, general public or the

44

University community at large. Examples of such behavior include on or off duty or off premises acts that adversely affect the University: 1. Any act which is physically assaulting 2. Behavior or actions that would be interpreted by a reasonable person as carrying a potential for violence and/or acts of aggression 3. Any act that threatens harm to another person or damage to property 4. Stalking (including electronic stalking). SGG 601.18.

235.   Defendant JACKSON alleged that the language of this post "disrupted, threatened, and intimidated students who were trying to actively participate in their educational programs and activities on campus and at Festifall."

236.   Plaintiff SAFE's Instagram post is pure speech protected by the First Amendment.

237.   No reasonable person could construe such speech as an "act of violence, threat, or aggression against others."

238.   In short, the attempt to discipline Plaintiff SAFE for making a non-violent statement of principle on its Instagram page is a clear and incontrovertible violation of the organization's and its members' First Amendment rights.

239.   Defendant JACKSON's attempt to ban Plaintiff SAFE from campus for, in large part, engaging in protected First Amendment activities is further underscored by the extreme sanctions sought against the organization — sanctions that are believed to be far in excess of those pursued against other organizations for similar conduct and far in excess of past practices and policies of the University.

240.   On December 13, 2024, a SOAR Hearing was held before a Student

45

Panel and facilitated by CCI staff.

241.    On January 16, 2025, SAFE received the Official University Decision regarding the SOAR complaint against them. The Official University Decision included both the findings of fact and recommendations of the Student Panel and the Official University Decision from Dean of Students Laura Blake Jones.

242.    The Student Panel found SAFE responsible for only three minor violations of the Standards.

243.    The Student Panel strongly rejected the Complainant's desired outcome of suspending SAFE. In fact, the panel noted that suspending SAFE:

> Would have a significant negative impact on the university community and on SAFE's over 100 members (per MaizePages). SAFE represents, and we have no evidence to contradict, that it is both a "legacy student organization" and the primary community group for Palestinian students on the University of Michigan campus. Depriving the community, including Palestinian students, of a cultural group would be serious, especially if we did so for 4 years– the length of time a typical college student spends at University of Michigan.

244.    The Student Panel further noted in their decision that "data provided by the CCI indicates that in the time from 2019-2024, **no student organization has been suspended from campus for protest-related behavior**, much less for selling food on the Diag".

245.    The DOS rejected the Student Panel's findings of facts and instead sanctioned SAFE with a 2–4-year suspension, alongside other educational measures.

46

246.   The DOS claims that her alternative findings of SAFE's responsibility are reasonable based on a preponderance of the evidence. Yet, the DOS did not point to any actual evidence provided by the Complainant that allowed her to reach a radically different conclusion than the Student Panel.

247.   Effective January 16, 2025, SAFE was suspended from the University of Michigan.

248.   The University's decision to suspend SAFE effectively eliminates the only designated student association for the University's Palestinian students to convene over a shared national origin, ethnicity, and related viewpoints.

249.   On February 6, 2025, SAFE appealed the Official University Decision and asserted the following grounds for appeal: (1) Proper procedures were not followed; (2) The evidence does not clearly support the finding; and (3) The sanctions are insufficient or excessive relative to the violations.

250.   On February 17. 2025, the Appeals Board recommended to the VPSL that SAFE's two-year suspension be removed, and instead of such a punitive sanction, outlined and recommended alternative educational measures.

251.   On Wednesday, March 26, 2025, SAFE received both the Appeals Board recommendations and the final determination of the VPSL.

252.   On March, 25, 2025 Defendant HARMON, as the University's Vice President for Student Life, ignored the recommendation from the Appeals Board and

47

upheld SAFE's two-year suspension.

253.   No such actions to unilaterally overturn the findings of a Student Panel and ignore the recommendations of an Appeals Board are known to have been taken by the University against any other student organizations participating in a SOAR proceeding.

254.   Neither Defendant TORRES nor Defendant JACKSON or other employees of Defendants GRAND RIVER are known to have ever filed a student disciplinary complaint against any student or student organization that advocates in support of Israel or in support of or in opposition to any other issues of public concern.

255.   In fact, Defendant TORRES and Defendant JACKSON are only known to have filed complaints on behalf of the University against students and student organizations that express views in support of divestment to stop a genocide against the Palestinian people.

256.   Likewise, the University itself is believed to have *only* ever initiated a complaint against students or student organizations for speech and protest related activities when they hold views in support of divestment to stop a genocide against Palestinian people.

257.   The University's actions constitute a pattern of practice and a policy or custom of retaliating against students and student groups that hold such views and

are implemented and sanctioned through Defendants REGENTS and ONO who have ultimate and official responsibility for the University's practices and policies.

## V.    CLASS ACTION

258.   The named Plaintiffs bring this action on their own behalf, and on behalf of the class of all others similarly situated.

259.   The class consists of all students who publicly advocated for the University of Michigan to divest from Israel as a means to help stop a genocide against the Palestinian people where, after October 7, 2023: a) disciplinary proceedings have been brought against them by Defendants TORRES, JACKSON, and/or other agents of the Defendants GRAND RIVER or any other University consultants, employees, or agents, or the University itself; or b) disciplinary proceedings required students to disprove the actions alleged against them by the University or its agents; or c) the student participated in the group arbitration that was resolved by Defendant HARMON's October 31, 2024 final determination on appeal where he accepted and modified the recommendations in the Appeals Board Report.

260.   The class of persons identified above is more than 35 persons and is so numerous that the joinder of each member of the class is impracticable.

261.   There is a well-defined community of interest in the questions of law and fact affecting the class that the named Plaintiffs propose to represent.

49

262.   The claims of Plaintiffs, and all others similarly situated, against Defendants involve questions of common or general interest, in that their claims are based on Defendants' failure to comply with due process during student disciplinary hearings as required by the Fourteenth Amendment, as alleged herein. These questions are such that proof of a state of facts common to the members of the class will entitle each member of the class to the relief requested in this Complaint.

263.   If individual actions were required to be brought by each injured or affected member of the class, the result would be a multiplicity of actions creating a hardship to Plaintiffs, and all others similarly situated, Defendants, and the resources of the Court. Furthermore, those Plaintiffs, and all others similarly situated, that are still enrolled at the University may be reluctant to raise individual claims for fear of retaliation  and lack of financial resources.

264.   Furthermore, those Plaintiffs, and all others similarly situated, that have graduated from the University of Michigan, are now geographically dispersed, and face significant barriers to bringing forward their claims A class action is an appropriate method for fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

265.   The named Plaintiffs will fairly and adequately represent the interests of the class because the named Plaintiffs are members of the class, and the claims of the named Plaintiffs are typical of the claims of those in the class.

50

266.   The named Plaintiffs have retained experienced counsel competent to represent the class.

267.   The adjudication of the putative Fed. R. Civ. P., Rule 23 class claims on a class action basis is superior to other means of adjudication of such claims and/or is desirable based upon the common actions of the Defendants towards the class and/or the risk of inconsistent adjudications and uncertainty regarding the proper standard of conduct by Defendants if such claims were subject to multiple individual litigations and/or the other criteria of Fed. R. Civ. P., Rule 23 are met warranting the class action certification of such claims.

## VI.   CAUSES OF ACTION

### COUNT I – 42 U.S.C. §1983 – Constitutional Violation
### U.S. Const., Amend. I & Amend. XIV – Free Speech (Deprivation of Free Speech Rights and Unlawful Prior Restraints on Speech)

268.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

269.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

270.   Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' free speech rights under the First and Fourteenth Amendments of the U.S. Constitution.

51

271.   The Freedom of Speech clause of the First Amendment reads: "Congress shall make no law … abridging the freedom of speech."   The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

272.   Under the Free Speech clause, state actors cannot retaliate or discriminate against persons because of the content of their speech, or the views expressed.[5]

273.   Moreover, under the Free Speech clause, state actors may not require a permit before persons can express certain viewpoints in public forums, may not require permits or otherwise provide a prior restraint to restrict speech because of opposition to the viewpoints expressed, and cannot otherwise require permits before persons may speak in such forums.

274.   Defendants' policies and practices violate constitutional protections for Free Speech by retaliating and discriminating against Plaintiffs because of the content of their speech and university officials' opposition to views the Plaintiffs expressed.

275.   Plaintiffs   CHAPPEL,   BAGDASARIAN,   ENO,   ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, engaged in constitutionally protected free speech.

---

[5] The few exceptions to this prohibition are not presented in this case.

276.   Defendants initiated student disciplinary proceedings against Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, solely for their expressions of pro-Palestine speech.

277.   But for their expressions of particular pro-Palestine viewpoints, Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, would not have faced student discipline.

278.   The University's use of student disciplinary sanctions is disproportionately targeted at these particular protestors, whose speech the University dislikes. Despite a long history of protest activity regarding countless issues at the University of Michigan, which has sometimes included acts of civil disobedience, it appears that no other group of protestors have been subjected to similar student disciplinary proceedings for the same or similar alleged activity.

279.   Defendants' policies and practices to sanction Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, with formal reprimands punished them solely for their expressions of pro-Palestine speech and diminished their standing as students by effectively put a black mark on their student records.

280.    The formal reprimand also serves as a prior restraint as it signals to a reasonable person that if they undertake similar activity – in this case expressing pro-Palestine speech and participating in protest activities – they will face greater disciplinary consequences.

281.    Plaintiff SAFE engaged in constitutionally protected speech and conduct.

282.    Defendants' policies and practices to sanction Plaintiff SAFE with a suspension from campus effectively punish the organization solely for their expression of pro-Palestine speech.

283.    But for their expressions of particular pro-Palestine viewpoints, Plaintiffs SAFE would not have been suspended from the University's campus.

284.    Because of their two-year suspension, Plaintiff SAFE has had to —and will continue to have to— forgo opportunities to attend and participate in on-campus protests and other activities involving protected speech, such as meeting and associating with students and student groups engaged in organizing protests.

285.    By banning Plaintiff SAFE from campus for two years, thus preventing the organization from organizing and attending on-campus protests and other expressive gatherings, Defendants are unconstitutionally burdening Plaintiff's SAFE's First Amendment right to free speech.

286.   The Defendants' policies and practices further violated Plaintiff SAFE's right to engage in Free Speech activities by seeking to impose permitting requirements that do not exist within the University's published rules and regulations; that were not required for other organizations engaging in the same or similar conduct on the Diag; that are not reasonable under the circumstances; and that were solely imposed upon the organization as a result of SAFE's viewpoint and University officials' opposition to that viewpoint.

287.   Defendants violate Plaintiffs Free Speech rights in that a) their actions to subject Plaintiffs to disciplinary proceedings and punishments are viewpoint- and content-based because the University has allowed other students and groups to demonstrate without such adverse consequences; b) they proscribe speech in public forums in a manner that is not narrowly tailored and is without substantial government justification; and c) their actions impermissibly restrain speech.

288.   As a direct and proximate result of the enactment and enforcement of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights to engage in free speech.

289.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

290.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together

with costs, and attorney fees.

291.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and TORRES, GRAND RIVER, and JACKSON, individually and in their professional capacities, together with costs, and attorney fees.

### COUNT II – 42 U.S.C. §1983 – Constitutional Violation
### U.S. Const., Amend. I & Amend. XIV – Deprivation of Rights to Petition

292.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

293.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

294.   Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' rights to petition under the First and Fourteenth Amendments of the U.S. Constitution.

295.   The Freedom to Petition clause of the First Amendment reads: "Congress shall make no law …… abridging the freedom ……  to petition the Government for a redress of grievances."  The First Amendment is incorporated

within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

296.   Under the Petition clause, state actors cannot retaliate or discriminate against persons because they sought to petition the government on issues of public concern.

297.   Plaintiffs sought to petition Defendants REGENTS, Defendant ONO, and their public University.

298.   Defendants adopted a pattern and practice of hindering, obstructing, harassing, and suppressing Plaintiffs' ability to petition Defendants REGENTS, Defendant ONO, and their public University.

299.   Defendants – acting as state actors – retaliated against Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, with disciplinary sanctions and Plaintiff SAFE with suspension for exercising their right to petition.

300.   Defendants' policies and practices violate constitutional protections for the Right to Petition university officials by retaliating and discriminating against the Plaintiffs because they sought to petition on matters opposed by university officials.

301.   As a direct and proximate result of the enactment of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their

constitutionally protected rights to petition public officials at the University and their public University.

302.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

303.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

304.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and TORRES, GRAND RIVER, and JACKSON, individually and in their professional capacities, together with costs, and attorney fees.

## COUNT III -- 42 U.S.C. §1983 – Constitutional Violation
### U.S. Const., Amend. I & Amend. XIV – Deprivation of Rights to Assembly

305.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

306.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

307.   Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that

violate Plaintiffs' rights to assembly under the First and Fourteenth Amendments of the U.S. Constitution.

308. The Freedom of Speech clause of the First Amendment reads: "Congress shall make no law … abridging the … right to of the people to peacefully assemble." The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

309. Under the Freedom of Assembly clause, state actors may not impermissibly restrict the ability of people to gather, assemble and advocate for their beliefs.

310. Plaintiff SAFE is the only undergraduate student organization dedicated to advocating for divestment and for the human rights and right of self-determination of the Palestinian people and for celebrating Palestinian culture and community.

311. The University's decision to suspend Plaintiff SAFE eliminates the only designated student association for the University's Palestinian students to convene over a shared national origin, ethnicity, and related viewpoints.

312. Defendants' policies and practices to ban Plaintiff SAFE from the University impermissibly infringe on students' rights to assemble in organizations expressing pro-Palestine viewpoints, fostering Palestinian community and culture, and advocating for Palestinian human rights.

313.   As a direct and proximate result of the enactment of Defendants' policies and practices, Plaintiff SAFE suffered, and continues to suffer, ongoing irreparable harm and will continue to suffer a loss of their constitutionally protected rights to assemble at their public University.

314.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiff SAFE.

315.   As a result of the forgoing acts and omissions, Plaintiff SAFE is entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

316.   As a result of the forgoing acts and omissions, Plaintiff SAFE is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and JACKSON, individually and in her professional capacity, together with costs, and attorney fees.

## COUNT IV – 42 U.S.C. §1983 – Constitutional Violation
### U.S. Const., Amend. XIV – Due Process (Deprivation of Property and/or Liberty Interest in Student Status)

317.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

318.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

319.    Acting under color of law and pursuant to the customs, policies and

practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' due process rights under Amend. XIV of the U.S. Constitution.

320.    The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of life, liberty, or property without due process of law."

321.    Under the Due Process clause, persons possess a property and/or liberty interest in their status as a student at a public university.

322.    The Due Process clause requires that before taking or diminishing one's property or liberty interests, state actors must provide persons notice of intended action; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

323.    Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF, and similarly situated persons, were subjected to student disciplinary proceedings that diminished their student statuses and that fell far short of the constitutional requirements of due process.

324.    Defendants' policies and practices, as stated above, violate the Due Process clause by denying students fair notice of the sanctions brought against them; denying students a fair opportunity to be heard in disciplinary hearings; by denying a fair opportunity to rebut evidence introduced against them; by failing to provide a

fair and impartial decision maker; and by failing to follow their own prescribed procedures.

325.  As a direct and proximate result of the enactment of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected due process rights.

326.  The Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF and similarly situated persons.

327.  As a result of the forgoing acts and omissions, Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF and similarly situated persons, are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

328.  As a result of the forgoing acts and omissions, Plaintiffs CHAPPEL, BAGDASARIAN, ENO, ELKOLALY, HASSABALLA and HILGART-GRIFF and similarly situated persons are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and TORRES and GRAND RIVER, individually and in their professional capacities, together with costs, and attorney fees.

**COUNT V – 42 U.S.C. §1983 – Constitutional Violation**
**U.S. Const., Amend. XIV – Due Process (Deprivation of Property and/or**
**Liberty Interest in Status as Recognized Student Organization)**

329.  Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

330.  Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

331.  Acting under color of law and pursuant to the customs, policies and practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' due process rights under Amend. XIV of the U.S. Constitution.

332.  The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of life, liberty, or property without due process of law."

333.  Under the Due Process clause, organizations possess property and/or liberty interest in their status as a recognized student organization with access to university property, financial resources, and bank accounts at a public university.

334.  The Due Process clause requires that before taking or diminishing one's property or liberty interests, state actors must provide persons notice of intended action; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

335.   Plaintiff SAFE possesses a property and/or liberty interest in their status as a recognized student organization.

336.   Plaintiff SAFE was subjected to a student organization disciplinary procedure that deprived it of its status as a recognized student organization fell far short of the constitutional requirements of due process.

337.   Defendants' policies and practices, as stated above, violate the Due Process clause by denying Plaintiff SAFE fair notice of the sanctions brought against them; denying SAFE a fair opportunity to be heard in disciplinary hearings; by denying a SAFE fair opportunity to rebut evidence introduced against them; by failing to provide a fair and impartial decision maker; and by failing to follow their own prescribed procedures.

338.   As a direct and proximate result of the enactment of Defendants' policies and practices, Plaintiff SAFE suffered and will continue to suffer a loss of its constitutionally protected due process rights.

339.   The Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff SAFE.

340.   As a result of the forgoing acts and omissions, Plaintiff SAFE is entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

341.   As a result of the forgoing acts and omissions, Plaintiff SAFE is entitled

to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and JACKSON, individually and in her professional capacity, together with costs, and reasonable attorney fees.

### COUNT VI – 42 U.S.C. §1983 – Constitutional Violation
### U.S. Const., Amend. XIV – Due Process (Deprivation in Liberty Interest in Free Speech, Petition and Association)

342. Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

343. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

344. Acting under color of law and pursuant to the customs, policies and practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' due process rights under Amend. XIV of the U.S. Constitution.

345. The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of life, liberty, or property without due process of law."

346. Under the Due Process clause, persons possess a liberty interest in their rights to free speech, petition, and association.

347. Under the Due process clause, organizations possess a liberty interest in their rights to free speech, petition, and association.

348.   The Due Process clause requires that before taking or diminishing one's property or liberty interests, state actors must provide persons notice of intended action; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

349.   Defendants' policies and practices, as stated above, violate the Due Process clause by denying Plaintiffs fair notice of the sanctions brought against them; denying Plaintiffs a fair opportunity to be heard in disciplinary hearings; by denying a fair opportunity to rebut evidence introduced against them; by failing to provide a fair and impartial decision maker; and by failing to follow their own prescribed procedures.

350.   Defendants' policies and practices violate Plaintiffs liberty interests in free speech, petition, and association by weaponizing student and student organization disciplinary proceedings to target Plaintiffs for their speech and association.

351.   But for their expressions of their rights of free speech, petition, and association, Plaintiffs would not have faced disciplinary actions by Defendants.

352.   As a direct and proximate result of the enactment of Defendants' policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected due process rights.

353.   The Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

354.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

355.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, and TORRES, GRAND RIVER, and JACKSON, individually and in their professional capacities, together with costs, and reasonable attorney fees.

### COUNT VII – 42 U.S.C. §1983 -- Constitutional Violation
### U.S. Const., Amend. XIV – Equal Protection Rights

356.   Plaintiffs repeat and re-allege the allegations contained in the above paragraphs.

357.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

358.   Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiffs' equal protection rights under Amend. XIV of the U.S. Constitution.

359.   The Equal Protection clause of Amendment XIV states, in pertinent part: "No state shall … deny to any person within its jurisdiction the equal protection of the laws."

360.   The Equal Protection clause requires state actors to treat similarly situated persons equally.

361.   Defendants' conduct, as described above, violate the Equal Protection clause by denying students and undergraduate organizations who advocate for Palestinian human rights and for the University of Michigan to divest from Israel equal application of the rules and policies of the University in the initiation and conduct of disciplinary proceedings.

362.   Defendants further violate the Equal Protection clause by intentionally targeting such students and organizations for disciplinary proceedings while knowingly allowing other students and organizations who espouse opposing viewpoints or who speak on other issues to regularly engage in the same or similar conduct without fear of being subjected to disciplinary proceedings.

363.   As a direct and proximate result of Defendants' customs, policies and practices, Plaintiffs suffered and will continue to suffer a loss of their constitutionally protected rights to equal protection.

364.   Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to the Plaintiffs.

365.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and reasonable attorney fees.

366.   As a result of the forgoing acts and omissions, Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages against Defendants ONO and HARMON, individually, TORRES, GRAND RIVER, and JACKSON, individually and in their professional capacities, together with costs, and reasonable attorney fees.

## VII.   JURY DEMAND

367.   Plaintiffs demand a trial by jury in this matter.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs pray this Honorable Court enter Judgment against Defendants providing:

a.   Declaratory relief holding that Defendants:

   i.   in the initiation and conduct of student disciplinary proceedings, violated Plaintiffs' right to freedom of expression by retaliating and discriminating against them because of the viewpoints that Plaintiffs express;

   ii.   in the initiation and conduct of student disciplinary proceedings, violated Plaintiffs' right to due process by denying students a fair opportunity to be heard; by denying a fair opportunity to rebut evidence introduced against them; by failing to provide a fair and impartial decision maker; and by failing to follow their own

prescribed procedures; and

   iii.     in the initiation and conduct of student disciplinary proceedings, violated Plaintiffs' right to equal protection by denying students and undergraduate organizations who advocate for Palestinian human rights and for the University of Michigan to divest from Israel equal application of the rules and policies of the University and by targeting students and undergraduate organizations who espouse such views for disciplinary proceedings.

b.  Injunctive relief prohibiting Defendants from:

   i.     Initiating or conducting disciplinary proceedings where an executive officer is the final adjudicator of complaints brought on behalf of the University against a student or a student organization;

   ii.     Conducting disciplinary hearings where the burden of proof is, in whole or part, upon a responding student or student organization to disprove the allegations of a complaint;

   iii.     Conducting disciplinary hearings where the University possesses recordings or other evidence that is relevant and potentially exculpatory, but refuses to provide it to the student respondents;

   iv.     Conducting disciplinary hearings where the student or an organization's silence in response to the allegations of a complaint are evidence of the respondent's guilt;

   v.     Changing the rules governing procedural, evidentiary, or burden of proof after the events at issue have occurred; while a disciplinary process is pending; or during the appeal of a disciplinary matter;

   vi.     Initiating disciplinary actions against a student organization for engaging in activity protected by the  First Amendment;

   vii.     Engaging in viewpoint discrimination against students and student organizations who express their support for Palestinian human rights and self-determination.

   viii.     Requiring permits for student organizations to engage in speech

activities on the Diag;

    ix.    Requiring undergraduate student organizations that advocate for the University to divest from Israel to obtain a separate permit to have a table on the Diag when such permits are not required of other organizations at the same event who advocate on other issues; and

    x.    Targeting students and undergraduate organizations who advocate for the University of Michigan to divest from Israel for disciplinary proceedings while permitting other organizations who espouse different views to engage in the same or similar conduct.

    xi.    Repealing all disciplinary actions taken against Plaintiffs and others similarly situated and reinstate all prior privileges and statues.

    xii.    Removing the suspension of Plaintiff Safe and reinstating SAFE back on the University's campus.

c.    Compensatory damages jointly and severally against the Defendants ONO and HARMON, individually, and TORRES, GRAND RIVER, and JACKSON, in their individual and professional capacities, in whatever amount is fair, just, and equitable for the injuries and damages sustained;

d.    Punitive damages against the Defendants ONO and HARMON, individually, and TORRES, GRAND RIVER, and JACKSON, in their individual and professional capacities, in whatever amount is fair, just, and equitable to deter future conduct in violations of students' constitutional rights;

e.    Interest, costs, and reasonable attorney fees; and

f.    Further relief as is just and equitable.

Respectfully submitted,

/s/  John C. Philo
John C. Philo (P52721)
Liz Jacob (P86981)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
tparis@sugarlaw.org
*Attorneys for Plaintiffs*

/s/  Julie H. Hurwitz
Julie H. Hurwitz (P34720)
Dayja S. Tillman (P86526)
Matthew S. Erard (P81091)
GOODMAN, HURWITZ, &
JAMES P.C. on behalf of the
NATIONAL LAWYERS GUILD,
DETROIT & MICHIGAN CHAPTER
1394 E. Jefferson Ave.
Detroit, MI 48207
313-567-6170/Fax: 313-567-4827
jhurwitz@goodmanhurwitz.com
dtillman@goodmanhurwitz.com
merard@goodmanhurwitz.com
*Attorneys for Plaintiffs*

/s/  Amy Doukoure
Amy Doukoure (P80461)
COUNCIL ON AMERICAN ISLAMIC
RELATIONS-MICHIGAN LEGAL
FUND
1905 Haggerty Rd., Suite #5
Canton, MI 48188
(248) 559-2247

adoukoure@cair.com
***Attorney for Plaintiffs***

/s/  Holland Locklear
Holland Locklear (P82236)
LAW OFFICES OF HOLLAND
LOCKLEAR, PLLC
607 Shelby St., Suite 725
Detroit, MI 48226
(833) 424-446/Fax: (248) 256-3334
holland@locklearlegal.com
***Attorney for Plaintiffs***

/s/  Sara Dagher
Sara Dagher (P87077)
3950 W. Eleven Mile Road
Berkley, MI 48072
(313) 474-4287
shhdagher@gmail.com
***Attorney for Plaintiffs***

/s/  Huwaida Arraf
Huwaida Arraf (NY 4707220)
c/o Goodman Hurwitz & James, PC
1394 E. Jefferson Ave.
Detroit, MI 48207
(248) 987-8701
huwaida4michigan@gmail.com
***Attorney for Plaintiffs***

/s/  Ezra Ritchin
Ezra Ritchin (NY 6085054)
367 St. Marks Ave, #1132
Brooklyn, NY 11238
(917) 725-0116
ritchinezra@gmail.com
***Attorney for Plaintiffs***

Date:  April 22, 2025

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

| | |
|---|---|
| Nora Hilgart-Griff, Jared Eno, Kristen Bagdasarian, Zaynab Elkolaly, Rhea Chappell, and Arwa Hassaballa, individually and on behalf of all others similarly situated, and Students Allied For Freedom and Equality (SAFE), | Case No. 2:24-cv-13425 Hon. Laurie J. Michelson Mag. Elizabeth J. Stafford |

           Plaintiffs,

v.

Regents of the University of
Michigan;
Santa Ono, individually and
and as President of the University
of Michigan,
Martino Harmon, individually and
as Executive Vice President and
Chief Financial Officer of the
University of Michigan; Omar E. Torres,
Grand River Solutions, Inc., and
Stephanie Jackson
,

           Defendants.

_____/

### CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically the Plaintiffs' *First*

*Amended Complaint & Jury Demand* with the Clerk of the Court using the ECF

system which will send notification of such filing to all attorneys of record.

Respectfully Submitted,

By: /s/ John C. Philo
John C. Philo (P52721)
SUGAR LAW CENTER FOR
ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
***Attorney for Plaintiffs***

**Date: April 22, 2025**