# EXHIBIT M



**January 16, 2025**

**TO:**     Joel Lauritzen, Program Manager for Student Development, CCI
        Nicholas Smith, Director, CCI

**FROM:**   Laura Blake Jones, Associate Vice President and Dean of Students

**Issuance of Official University Decision for SOAR Complaint 25-101**

Receiving the recommendation of the Central Student Judiciary (CSJ) from the Center for Campus Involvement (CCI) regarding Student Organization Complaint #25-101 on December 13, 2024, I write to communicate the OFFICIAL UNIVERSITY DECISION on this matter.

Complaint #25-101 was filed against Students Allied for Freedom and Equality (SAFE) under the *Standards of Conduct for Recognized Student Organizations* on October 31, 2024. The Center for Campus Involvement gave the parties notice that a complaint was filed and established a time for a response and supporting documentation to be submitted. The Center for Campus Involvement determined that a hearing conducted by CSJ was the most appropriate option for resolution. The hearing was held on December 5, 2024, before a properly convened CSJ hearing panel composed of four justices. I have received and reviewed the recommendations from CSJ.

The Dean of Students issues the official University decision and has the power to uphold, overturn, or modify CSJ's recommended findings and sanctions. Today I write to inform you that the official University decision supports many of the recommendations proposed by CSJ and also overturns and modifies other findings and sanctions, including the addition of a two-year Disciplinary Suspension of SAFE's organizational status reviewable upon completion of additional sanctions/educational measures no sooner than Winter 2026. The University Decision is outlined in greater detail below and organized into four parts:

 I.   Statement of Authority's Recommendation (appended at the end of this decision)
 II.  Statement of the University Decision
 III. Statement of Sanctions
 IV.  Rationale for Changes


 I.   **STATEMENT OF AUTHORITY'S RECOMMENDATION (see Appendix)**

 II.  **STATEMENT OF UNIVERSITY DECISION**

**Findings of Responsibility**

CSJ recommended the following findings of responsibility: SAFE is responsible for two of four violations occurring at Festifall; SAFE is responsible for one of two violations related to the Michigan In Color event; and

SAFE is responsible for none of the seven alleged violations occurring during the protest at the home of Regent Sarah Hubbard.

The University's decision with regard to findings of responsibility is as follows: CSJ's findings of responsibility regarding the Festifall-related violations are upheld in part and overturned in part; CSJ's findings of responsibility regarding the Michigan In Color event-related violations are upheld; CSJ's findings of responsibility regarding the violations at the home of Regent Sarah Hubbard are overturned.

**Findings Related to Festifall**

CSJ found SAFE responsible for holding a demonstration on the Diag during Festifall without University permission. I am upholding this finding as a violation of Standard III.B.6 (Appropriate Use of Space) and III.B.10 (Adherence to Other University Policies). I am also upholding CSJ's finding that SAFE was responsible for obstructing the flow of traffic through the Diag at Festifall as a violation of Standard III.B.6 (Appropriate Use of Space) and III.B.10 (Adherence to Other University Policies). I agree with the rationale offered by CSJ.

SAFE asserted that it should not be held accountable for the actions of individuals and that, even if members of its organization attended a particular protest, that should not impute responsibility onto the organization. This concept is relevant for several of the allegations against SAFE. I agree with CSJ's statement that "SAFE at least tacitly approved of its members' actions in engaging in the protest" at Festifall. CSJ came to this conclusion by relying on the Standard of Conduct's description of when a Recognized Student Organization is responsible based on its member's actions, including when a member's actions "have been explicitly or tacitly approved by the organization." The evidence shows that SAFE advertised the event on social media, stating on Instagram "Join us on the Diag TOMORROW at 2:30pm to remind admin of their complicity in genocide!!!...". By promoting the event on its social media page, using "us" to describe who was facilitating the event, and identifying their organization as the "collaborator" of the event, it is reasonable to conclude that, at a minimum, SAFE approved of its member's actions on the Diag during the Die In (which occurred at the same time as Festifall).

I also agree with CSJ's assertion "that it would be an unworkable standard-every time a student participated in something the University thought was against the rules, it would implicate every club they are a member of." However, we cannot take the equally extreme opposing position that an organization is never responsible for actions simply because an individual carried out the actions. Instead, we agree with CSJ's suggestion to make decisions based on the guidance in the Standards of Conduct of when an RSO is responsible for a member's acts.

The evidence supports SAFE's repetitive and flagrant disregard of University policy and instruction. Prior to Festifall, CCI Director Smith emailed SAFE leadership and informed them as follows.  "...I wanted to connect with you about an advertised die-in demonstration on the Diag tomorrow…As you may be aware, the Diag is reserved by the Center for Campus Involvement (CCI) tomorrow for Festifall.  The Diag is unavailable for additional reservations or activities tomorrow.  Festifall involves significant pedestrian traffic, and maintaining clear pathways is essential.  Any obstruction can disrupt the event and pose safety risks…The University will enforce its policies…I understand and respect your desire to express your views. I am happy to assist you in reserving the Diag on a different date and time for your event that does not conflict with other scheduled activities…"

As the evidence indicates, alternative options were offered to SAFE for the Die In and signs were placed on the Diag informing students that the Diag was reserved, exclusively, for Festifall that day. Nonetheless, SAFE

proceeded with its Die In on the Diag during Festifall. In order for the University's 1,000+ organizations to function together, we need organizations to understand that they cannot use any space, at any time, for any purpose of their choosing.

CSJ found SAFE not responsible for creating a safety hazard by sitting and impeding pedestrian traffic with their bodies during the Die In. I am overturning this and find SAFE responsible for violating Standard III.B.10 (Adherence to Other University Policies). Thousands of students attend Festifall each year. It is a very large event (according to the Complaint, 965 student organizations registered to attend in 2024) where the entire student body is invited to traverse the Diag and learn about opportunities and organizations that may be of interest to them. CCI reserved the Diag exclusively for Festifall that day because it is such a consuming event with a high volume of foot traffic. Even in the absence of a fire marshal's expert opinion at the hearing, I am able to assess that the laying down of students on the Diag during an event like Festifall creates a safety hazard and impedes traffic.

CSJ found SAFE not responsible for violating the Standards of Conduct with regard to its Instagram and whether it violated University policy. I am upholding CSJ's recommendation and find SAFE not responsible.

**Findings Related to the Michigan in Color (MIC) Event**

CSJ found SAFE responsible for selling food on the Diag at the Michigan in Color Event and not responsible for failure to obtain a permit for tabling at the Michigan in Color Event. I am upholding both recommendations and agree with CSJ's rationale.

I also acknowledge that the finding of responsibility for selling food has already been addressed in a restorative manner prior to these proceedings.

**Findings Related to the Protest at a Regent's Home**

CSJ found SAFE not responsible for allegations involving a protest at the home of Regent Sarah Hubbard. I am overturning these recommended findings and find that SAFE violated the Standards of Conduct when it held a protest on Regent Hubbard's front lawn on May 15, 2024.

I am in agreement with CSJ that behavior that occurs outside of the City of Ann Arbor or outside University-controlled property may violate the Standards of Conduct if the behavior poses "an obvious and serious threat or harm to any member(s) of the University community." The conduct in question must - and did - meet this heightened bar in order to find a violation.

I am not compelled by CSJ's comparison of the protest to situations like "people walk on other people's property at times" or that the protest was merely "surprising and annoying." The following pieces of information, in particular, have convinced me that SAFE's behavior did pose an obvious and serious threat or harm to Regent Hubbard.

- Arriving unannounced to someone's front porch in the early hours of the morning in a mask to deliver a demand letter, as displayed by the Ring doorbell videos, photos and Regent Hubbard's May 19, 2024, Channel 4 TV news interview on "Flashpoint."
- Littering the porch and lawn of a private residence with body bags covered in 'blood', broken cribs, and other items intended to depict a genocidal scene involving the deaths of infants and children, as displayed in various photos in evidence and SAFE's Instagram videos

- Using a bullhorn in a residential setting while most individuals are likely still asleep, circling Regent Hubbard's driveway again and again, as shown in the videos in evidence
- Leaving behind the items listed above for Regent Hubbard to clean up, including heavy, jagged, and broken items, as indicated in the evidence

The impact these behaviors have is even more so exacerbated when they occur in the setting of a private residence. SAFE's conduct on Regent Hubbard's front lawn took things to a personal level and, in my opinion, this behavior that CSJ described as an "alarming and intimidating disruption" would evoke fear and present as an obvious and serious threat or harm to any reasonable person who was watching it unfold from inside their private home and actually did so to Regent Hubbard.

CSJ rightfully questions whether the behavior in question should be attributed to SAFE as an organization. Using the same standard employed by CSJ for finding SAFE responsible for the behavior of individuals at the Die-In, I also believe that SAFE participated in the protest on the lawn of the home of a UM Regent. SAFE conceded that its members were at the protest.

Further, on the day of the event (May 15, 2024), SAFE made these posts on social media, which was included in the case evidence: "Good morning, Regent Hubbard. Students deliver demands to Regent Sarah Hubbard's Home," "Good Morning @thesarahhubbard…we will continue to protest. You cannot hide. We demand divestment and will remain relentless in the struggle for a free Palestine." Similar to its social media posts about the Die In, it used its @safeumich handle to make these statements and used ownership phrases like "*we* will continue to protest" when sharing a video of the protest at Regent Hubbard's. For these reasons, I disagree with CSJ's position that it is unclear whether SAFE organized and attended the protest and find that SAFE explicitly or tacitly approved its members' actions, which contravene the Standards of Conduct.

### III.  STATEMENT OF SANCTIONS

CSJ recommended the following sanctions:

- 1 month prohibition on reserving outdoor space or using outdoor University spaces for SAFE activities
- An educational project (training of SAFE executive team for not more than 2 hours on appropriate use of space and permitting process for events, especially outdoor events)
- $75 fine
- Formal written reprimand for "holding a protest on the Diag without a permit and thus obstructing the flow of traffic during Festifall" and "sale of food items on the Diag"
- A Formal Written Reprimand for "holding a protest on the Diag without a permit and thus obstructing the flow of traffic during Festifall" and the "sale of food items on the Diag"

The University accepts all of the above recommended sanctions and modifies them by adding a two-year Disciplinary Suspension that is reviewable upon completion of the below educational measures, no sooner than Winter 2026.

**Educational Conversations Involving A Minimum of Three SAFE Executive Leadership:**

   1)   A meeting with the Associate Vice President and Dean of Students, Dr. Laura Blake Jones facilitating a more comprehensive understanding of the University Decision in this matter.

   2)   A meeting with Associate Dean of Students, Dr. Sarah Daniels and the Center for Campus Involvement Director (CCI), Dr. Nick Smith focused on increasing the organizational leaders' awareness of University policies applicable to student organizations, and how individuals engaging in expressive activity on and off-campus can undertake such activities while operating within the boundaries of University policy.

   3)   A meeting with CCI staff members, as scheduled by CCI Director Smith, to further clarify student organization policies and procedures creating the conditions where the organization will be well-prepared and ready to return as a recognized student organization when allowed in the future.

*Note: SAFE's advisor is welcome to participate alongside SAFE leadership in any/all of the conversations.*

If the above measures are satisfactorily completed, such that the organization has demonstrated via staff-facilitated conversations that they have come to understand the policies related to the privileges of having recognition and being able to utilize space on campus and taken responsibility for their actions, the Disciplinary Suspension will be removed earlier than the expiration of two years (but no sooner than Winter 2026).

**IV. RATIONALE FOR CHANGES**

While I concur with many of CSJ's recommended findings and restorative outcomes/sanctions, in summary, I believe they enacted too narrow an interpretation on both the safety hazard posed by the Die-In occurring at Festifall and on the harmful and serious nature of the behaviors exhibited at the home of a Regent. The preponderance of the evidence supports findings in both situations, as discussed above. The modifications to the sanctions/restorative measures are intended to more fully enact accountability, promote compliance with the Standards of Conduct, and to amplify the educational nature of this process.

More generally, at least one of the Justices focused on the fact that the University cannot bring a complaint. This is untrue. Page 3 of the SOAR Procedure Manual states, "When the circumstances warrant, the process also allows the University to bring complaints against student organizations for violations of the Standards...".

**CONCLUSION**

In conclusion, I also want to highlight that I took note of one of the witness's expressed hope that the University would not institute the full two-to-four-year suspension of recognition of SAFE that was requested by the complainant. I recognize that SAFE's history on campus and impact as a legacy organization supporting Palestinian students on the University of Michigan's campus has been instrumental, and hope that the

organization's leaders will work in good faith to complete the educational and restorative measures outlined in this decision so the organization can return to recognition.

Sincerely,

Laura Blake Jones
Associate Vice President and Dean of Students

APPENDIX

I.  STATEMENT OF CSJ'S FINDINGS AND RECOMMENDATIONS (CSJ PANEL)

**This Appendix contains the exact wording of the findings, recommendations for restorative measures and rationale from the CSJ Student Governing Board Hearing panel:**

"The party bringing the complaint must convince the SGB Hearing Panel through a preponderance of the evidence that the student organization or individual member acting on behalf of the organization has violated the Standards of Conduct for Recognized Student Organizations." (2022 SOAR Procedure Manual)

**Festifall**

**"Held a demonstration on the Central Campus Diag on August 28, 2024, during Festifall without University permission and after notice was sent to S.A.F.E. denying any request to use that space that day;" – RESPONSIBLE (SGB vote 4-0)**

The primary issue raised in response to this allegation was that of agency–who organized the protest? After all, under the Standards for Student Organizations, it is insufficient for us to find that SAFE members simply participated in the protest. That would be an unworkable standard–every time a student participated in something the University thought was against the rules, it would implicate every club they are a member of.

However, there are other ways to get to the conclusion. The Standards for Student Organizations provide incredibly broad rules of when behavior of members of a RSO can be imputed upon the RSO:

A RSO is responsible for a violation of the Standards of Conduct if:

> 1. a member acts in contravention to the Standards of Conduct as a representative of the organization;
> 2. the member's actions, which contravene the Standards of Conduct, result from the practices or dispositions of the RSO; or,
> 3. the member's actions, which contravene the Standards of Conduct, have been explicitly or tacitly approved by the organization.

Here, we find that SAFE at least tacitly approved of its members' actions in engaging in the protest.

**Held a demonstration without an appropriate reservation and, in doing so, obstructed the flow of traffic through the Diag and disrupted the already-scheduled event on the Diag. (III.B.6 and III.B.10) – RESPONSIBLE (SGB vote 4-0)**

This allegation is very similar to the prior one, with the addition of the fact that the protest organized by SAFE and other groups "obstructed the flow of traffic through the Diag." Based on videos, the protest did partially obstruct the flow of traffic through the Diag. Therefore, we find SAFE responsible for this allegation.

**S.A.F.E. created a safety hazard by sitting and impeding pedestrian traffic with their bodies while holding objects as part of their die-in event. – NOT RESPONSIBLE (SGB vote 4-0)**

While it is true that SAFE members obstructed the flow of people through the Diag somewhat per video evidence, with at minimum SAFE's tacit approval, there is no evidence that this was a genuine safety hazard. The Diag is a large outdoor space where people sit, lie down, put up hammocks, and engage in many activities on a regular day. The Complainant could have called witnesses who are experts on safety in this context, such

as the fire marshall, but chose not to. In an absence of evidence, we find SAFE not responsible for this allegation.

**Festifall Instagram Post and the Policy Against Violence — NOT RESPONSIBLE (SGB vote: 4-0)**

The complaint stated that "S.A.F.E. sent the message to the campus community through their Instagram that they would not be "going back to school during a genocide" and so disrupted, threatened, and intimidated students who were trying to actively participate in their educational programs and activities on campus and at Festifall. This was a clear interference with the educational function of the University, notwithstanding the actions of the four individuals whose conduct resulted in their respective arrests."

The relevant policy at issue is University of Michigan's policy against violence, which bans, among other things, "Behavior or actions that would be interpreted by a reasonable person as carrying a potential for violence and/or acts of aggression" and "Any act that threatens harm to another person or damage to property" (SPG 601.18). SAFE's post did not violate this policy. A reasonable person would not interpret a student group stating that they didn't intend to go back to school as normal "during a genocide" as "behavior or actions" carrying a potential for violence or as threatening harm to a person or property. That is simply not the meaning the words convey. The statement can rightfully be interpreted as at least implying that members of the organizations who posted it (this was posted by JVP, DSA, and Tahrir as well) might engage in actions such as protesting, posting flyers, raising awareness for their cause, etc. But to assume that any change to "business as usual" would be violence is not rational, especially given the historical context at University of Michigan, where the university is proud of its record of allowing nonviolent protest.

Additionally, there is no evidence that other students interpreted the post as threatening or intimidating. Many students attended Festifall, and in fact *The Michigan Daily* reported that turnout was better than expected. Over 900 student groups participated, per a *Michigan Daily* article. These are not actions congruent with a claim that students felt intimidated. Additionally, to the SGB's knowledge, no complaints were made by any student, faculty member, or staff member who was present at Festifall about the protest or the counterprotest.

**October 16, 2024 Michigan in Color Event — RESPONSIBLE for sale of food (SGB vote: 4-0), NOT RESPONSIBLE for lack of permit – (SGB vote: 4-0)** The Complainant alleges that

"On October 16, 2024, S.A.F.E. set up an event on the Diag during which it offered food and other items for sale." According to the complaint, if true, these actions would constitute a violation of the Standards of Conduct's III.B.6 and III.B.10. The former is a requirement to adhere to appropriate use of University spaces; it states that "RSOs must use University-controlled spaces in accordance with the standards of the particular space". The latter is a requirement to follow all other University policies; it states that "RSOs must adhere to University policies, including but not limited to the Statement of Student Rights and Responsibilities, University's computer use policies, Policy on Alcohol and Other Drugs, Student Sexual Misconduct and Gender-Based Misconduct and Other Forms of Interpersonal Violence Policy, Dance and Party Policy, Diag Policy and housing policies."

The only evidence provided by the Complainant for this allegation is a screenshot of a post from SAFE's Instagram account. The post depicts a small portion of a table, on top of which is what seems to be an open

container of food, some papers advertising the food, and a caption that reads "come to the diag!!! We're selling kuffiyehs, shirts, manaeesh and more!!! All proceeds to palestine!" (Complainant Evidence Exhibit 8). The Complainant interpreted this post on the SAFE Instagram page to be sufficient evidence to support their initial allegation. The Complainant concluded that because of these actions, "S.A.F.E. continues to demonstrate a disregard for rules regarding the appropriate use of the Diag, which require organizations to first obtain a permit before setting up an event on the Diag".

In its response, the Respondent rejects the allegation in part; SAFE acknowledges that it sold food, but it asserts that it "was not responsible for the organization or for the permits for the event" (Response Brief). SAFE claims that it was "not aware" of the Diag policies' prohibition against the selling of food, and that upon being made aware by the CCI staff via email, "SAFE immediately updated its internal policies and hasn't sold food on the Diag again" (Response Brief). SAFE also made note in its response that "many student groups regularly sell food on the Diag", and that this had led them to believe that doing so was permissible. Then, SAFE directly denied that it had violated any rules regarding permitting. They affirmed that they had not organized the tabling event, but that Michigan in Color ("MiC"), a separate organization, had instead, and that SAFE was merely invited to participate. This was evidenced by a copy of the approved permit granted to Michigan in Color.

During the hearing, the SGB inquired further about the details of this event. The SGB first questioned the Complainant about what evidence in particular demonstrated that SAFE participated in this event, to which Ms. Jackson replied by stating that Student Orgs require a permit for tabling events, and because SAFE had no such permit, they must be responsible. The SGB noted the Respondent's claim that Michigan in Color held the event; this fact remained uncontested for the remainder of the hearing. The SGB then directly asked the Respondent if they had participated in selling food during the event, to which the Respondent answered in the affirmative.

The SGB finds as follows: on October 16, 2024, Michigan in Color (MiC)–a project by *The Michigan Daily*– hosted an art event on the Diag. This event was titled "Open Mic Night", and has purportedly been held annually for at least the past five years. SAFE was one of at least eight other student groups invited to participate under Michigan in Color's direction and organization. SAFE had no special role in the organization of this event, nor did it "set up" the event. While the SGB has found, from provided evidence and testimony provided during the hearing, that it is more likely than not that SAFE has violated the Policies for Diag Use's provision stating that "'No sales of food, including "suggested donations", are permitted on the Diag"', its actions do not align with the characterization provided by the Complainant and do not violate any other University policies. Therefore, the SGB finds the application of both III.B.6 and III.B.10 to be inappropriate for this allegation. SAFE's conduct only violates the Policies for Diag Use; these policies trivially fall under the "standards for the particular space" of the Diag; given that these are the only relevant policies, no *other* University policies apply. Thus, the only relevant violation of the Standards of Conduct is III.B.6.

**Protest at Regent Hubbard's House**

On May 15, 2024, a protest occurred at Regent Hubbard's home, which is outside Ann Arbor. It is unclear who organized the protest. However, SAFE did post about the protest on the organization's Instagram page.

The complaint cites the Standards for Student Organizations rule III.B.1 as the rule violated. This rule states that RSOs must not "foster, promote, or participate in activities that unreasonably threaten the safety or wellbeing of their members, other people, or animals." However, this rule does not apply here. As noted earlier, Regent Hubbard does not live in Ann Arbor or on University of Michigan-controlled

property, such as on campus. To quote the Standards for Student Organizations, "RSO behavior that occurs within the City of Ann Arbor, on University-controlled property, or at University sponsored events or programs may violate the Standards of Conduct. **Behavior that occurs outside of the City of Ann Arbor or outside University-controlled property may violate the Standards of Conduct if the behavior poses an obvious and serious threat or harm to any member(s) of the University community**" (emphasis ours). Therefore, the correct rule restricting RSO behavior at Regent Hubbard's house is if the behavior "pos[ed] an obvious and serious threat or harm to any member(s) of the University community." The only exceptions to this would be if it was "on University-controlled property" (which Regent Hubbard's house and the surrounding area is decidedly not), or possibly if part of a University-sponsored event (which the protest at Regent Hubbard's house was not, according to testimony elicited by the SGB at the hearing).

Further, the rules for outside Ann Arbor necessarily refer to 'RSO behavior.' We cannot impute responsibility for the entire protest at Regent Hubbard's house to SAFE, the relevant RSO in the case. SAFE wrote that "students" took this action, and did not claim responsibility as an organization for the protest, nor did it appear to pre-publicize the event. In fact, one of its witnesses at the hearing stated that SAFE often says "we" when speaking about actions taken by other groups or persons associated with the diffuse pro-Palestinian movement. It is quite possible and even likely that SAFE members participated in the protest, but per the Standards for Student Organizations, "RSO's are not presumed to be responsible for the independent acts of their individual members or autonomous RSOs that are subordinate to the original RSO (hereinafter collectively referred to as members)." With these understandings, we turn to the specific allegations. All unattributed quotes are from the complaint.

1. **"Showed up, uninvited to the front door of Regent Hubbard's personal home by sending a member in a full face covering / mask to post demands on her door. The Ring doorbell photographs of this show how terrifying it would be to wake up and see that an unknown masked individual is approaching your door at 6am." — NOT RESPONSIBLE (SGB VOTE 4-0)**
    a. The person who showed up (allegedly uninvited) and rang the doorbell is also alleged to have been wearing a full-face face covering or a mask. Due to this, there is no evidence who this person was. Not knowing who the person was, the SGB has no idea if this person was or was not a member of SAFE, and in the absence of evidence we conclude they were more likely not. Additionally, showing up to someone's house uninvited and ringing their doorbell while wearing a mask or face covering does not necessarily pose an "obvious and serious threat or harm" to that person. It may be surprising and annoying, especially at 6 am, but one's doorbell exists for a reason, and people wearing masks and face coverings has been a reality in the world since the emergence of COVID-19, if not before.
2. **"Trespassed onto Regent Hubbard's front lawn, front porch, and driveway and set up tents, and littered debris such as body bags, cement blocks, and baby dolls on Regent Hubbard's personal property" — NOT RESPONSIBLE (SGB VOTE 4-0)**
    a. Again, we do not know that SAFE did this. It is hard to say that an organization can even "trespass," though its members certainly can. It is possible that SAFE members did "trespass" – if this means "enter land without permission" or something of the like, as some dictionary definitions provide. But if trespass here was used in the legal sense under relevant state law in Michigan (MCL 750.552), it would mean either "[e]nter the lands or premises of another without lawful authority after having been forbidden to do so by the owner or occupant or the agent of the owner or occupant" or "[r]emain without lawful authority on the land or premises of another after being notified to depart by the owner or occupant or the agent of the owner or occupant." There was no evidence that the people who entered the property had been forbidden to do so. It would be odd for Regent

      Hubbard or her agents to prohibit people she apparently doesn't know from entering her property. Nor is it clear that they "remain[ed]…after being notified to depart." No evidence was given that they were told to leave the property.

    b. Even if SAFE did this, the SGB does not find that the behavior of entering another's property poses "an obvious and serious threat or harm" to a community member. People walk on other people's property at times, and doing so is not inherently an obvious and serious threat to the presumed property owner.

3. **"Used bull horns and bass drums to create alarming and intimidating disruption at and around Regent Hubbard's home during a time many individuals in her neighborhood would be asleep." — NOT RESPONSIBLE (SGB VOTE 4-0)**

    a. We found that this does not constitute a rule violation. We do not know if members of SAFE used bullhorns and drums. Further, even if they did, SGB does not find that making noise in such a manner, even at 6am, poses "an obvious and serious threat or harm" to a community member.

4. **Left a blood-soaked body bag blocking the front door, and other items, including a crib, on her front porch. Regent Hubbard, and her husband, could no longer exit the front door due to these items and could no longer drive away given that the demonstration took over her front yard and driveway. The inability for Regent Hubbard to leave her house via car or foot during the protest unequivocally threatened her wellbeing and safety. — NOT RESPONSIBLE (SGB VOTE 4-0)**

    a. We found that there was not sufficient evidence to determine who left the items on the front porch, or that the "body bag" was "blood-soaked." Again, it is unclear to us how leaving items that appear to be cloth covered in red paint and a crib pose an "obvious and serious threat or harm" to a community member. Nor was it clear that Regent Hubbard could not exit her home during the protest (house doors usually open inwards, and most homes have multiple modes of egress, even multiple doors) or that her driveway was so blocked that she could not use it. Therefore, we cannot find that Regent Hubbard was unable to leave her house via car or foot during the protest.

5. **"Left Regent Hubbard's property without cleaning up the voluminous and unsafe debris placed in her yard and front porch as part of the demonstration." — NOT RESPONSIBLE (SGB VOTE 4-0)**

    a. Certainly, it seems possible that items were left after the demonstration. However, little proof accompanies these allegations. There was no proof provided that the litter was unsafe. Therefore, we do not determine at a more likely than not standard that the littering posed an "obvious and serious threat or harm" to a community member. Once again, we also do not know what actions were taken by SAFE members, if any, related to the litter.

6. **"Promoted Regent Hubbard's private home location to the public." — NOT RESPONSIBLE (SGB VOTE 4-0)**

    a. Due to the fact that the alleged conduct of posting on Instagram occurred at an unknown location, we elect to apply the full Standards for Student Organizations rules to analyze this alleged conduct.

    b. SAFE's Instagram did include a photograph of a porch that is presumably part of Regent Hubbard's house. However, we do not find that this "promoted" the location, as posting a photograph of part of a house does not indicate the location of the home. From the Instagram posts, SGB was unable to determine the location of the home.

    c. The complaint makes much of a post that is quoted to say "GOOD MORNING, @thesarahhubbard…Regent Hubbard, we will hold you accountable for the 35,000+ Palestinians martyrs whose death you funded and profited from….we will continue to

protest. You cannot hide." The complaint attempts to link the "you cannot hide" language to the alleged "promoting" of her home's location. However, when viewing the actual Instagram post in context, the SGB found that it was referring to Regent Hubbard's decision to take a covert selfie near the "free Gaza encampment," which gives the language a significantly different meaning.

7. **The demonstration "posed an obvious and serious threat or harm to a member of the University community" — NOT RESPONSIBLE (SGB VOTE 4-0)**

    a. Demonstrating does not de facto pose "an obvious and serious threat or harm" to a member of the university community, despite this conclusory allegation. Nor did Ms. Jackson present evidence that this specific demonstration posed an obvious and serious threat or harm to anyone.

**Recommended Restorative Measures**

The Central Student Judiciary proposes the following restorative measures:

- 1 month prohibition on reserving outdoor space or using outdoor University spaces for SAFE activities (including the Diag) (the month will be January 2025) ● Educational project (training of SAFE executive team for not more than 2 hours on appropriate use of space and permitting process for events, especially outdoor events) to be completed in January (if not completed in January, reservation restriction remains until the training is completed)
- $75 fine
- Formal written reprimand for "holding a protest on the Diag without a permit and thus obstructing the flow of traffic during Festifall" and "sale of food items on the Diag"

The SGB believes that these sanctions will serve their restorative purpose to both acknowledge the harm caused by SAFE's policy violations and to prevent future violations.

**Rationale for Recommended Restorative Measures**

This *is* a restorative and educational process, per the 2022 SOAR procedure manual. The procedure manual says "[t]he purpose of the accountability process is to resolve a dispute using a restorative justice lens, considering the harm done and how harm can be repaired and prevented in the future." In light of that, it was difficult to determine what would be restorative when the complainant would not discuss restorative justice with the panel. Nor do we need to disregard the complainant's refusal to answer that question–only students have the right to not answer questions without a negative inference being made.

The SGB considered mitigating factors, such as confusion over a policy or lack of knowledge about a policy, in crafting the educational sanction. This is relevant for the food restrictions and Diag policies, which exist in at least 5 different locations per the SGB's count. Another mitigating factor we consider is the actions of the student organization's leaders after being confronted with their rule violation regarding the sale of food on the Diag. The SGB understands that the SAFE leadership apologized for their actions and changed internal policies to prevent a recurrence of the event in response to being contacted about their rule violation. This is a very positive sign, because it shows that they took responsibility and made efforts to change.

Yet another consideration the SGB made was the impact that suggested sanctions might have on the University community as a whole. For example, the complainant requested that SAFE be suspended from the University for 2-4 years. This would have a significant negative impact on the university community and on SAFE's over 100 members (per MaizePages). SAFE represents, and we have no evidence to contradict, that it is both a "legacy student organization" and the primary community group for Palestinian students on the University of Michigan campus. Depriving the community, including Palestinian students, of a cultural group

would be serious, especially if we did so for 4 years–the length of time a typical college student spends at University of Michigan. Witnesses testified about the positive effect of having such a community group on campus for their ability to feel welcomed in the University of Michigan community. Prior SGBs have considered similar factors in determining the length and severity of sanctions in other SOAR cases. Further, the 2022 SOAR procedure manual states that the SGB "may consider past behavior of the organization or its individual members acting as representatives of the organization." In addition to the pro-social activities SAFE has engaged in previously, we are not aware of any prior allegations of rule violations against SAFE.

Additionally, as we did not find that all 16 violations were supported by fact, we believe it is appropriate to deviate from the recommendations made by the complainant. The SGB asked the complainant what she thought we should do if we found not all allegations were supported by fact, and she did not offer any recommendation for sanctions beyond the 2-4 year suspension already requested. Furthermore, the complainant has not been a member of the University of Michigan community for long, and therefore likely does not understand the balancing of factors that is appropriate here. For example, she represented that the recommendation involved "benchmarking" against similar allegations and punishments that had been sustained against other student organizations and rendered her recommendation appropriate. However, the complainant's portrayal of the data was inaccurate. Data provided by the CCI indicates that in the time from 2019-2024, no student organization has been suspended from campus for protest-related behavior, much less for selling food on the Diag.

Many of the allegations are duplicative, in that they allege the same conduct violates substantially similar rules. For example, some conduct allegedly violates the SSO rule against violating other campus policies *as well as* a specific campus policy. These violations are aggregated for the purposes of recommending sanctions, because to do otherwise would be fundamentally unfair.

Finally, the SGB does **not** find a pattern of rule violations here. Instead, we have two very distinct and unrelated incidents–a die-in protest and the sale of food on the Diag. The rule violation for the MIC event does not appear to have been willful.
 For the aforementioned reasons, the SGB believes its recommended sanctions are appropriate in light of the totality of the circumstances.